Main Document Page 1 of 100

Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address

Nicole Prause
PO Box 1318
Sacramento, CA 95812
Email: Nicole.Prause+Bankruptcy@gmail.com

☒ *Respondent appearing without attorney*
☐ *Attorney for Respondent*:

FOR COURT USE ONLY

FILED
JAN 11 2021
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: Deputy Clerk

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

In re:
Nicole Prause

Debtor(s).

CASE NO.: 2:20-bk-I 7525-NB
CHAPTER: 7

**RESPONSE TO MOTION REGARDING THE AUTOMATIC STAY AND DECLARATION(S) IN SUPPORT**

DATE: 12/08/2020
TIME:
COURTROOM: 1545
PLACE: 255 East Temple Street,
Los Angeles, CA 90012

**Movant:** Aaron Minc

**Respondent:** ☒ Debtor ☐ trustee ☐ other:

NOTE REGARDING FILING AND SERVICE OF RESPONSE, EXHIBITS AND DECLARATIONS:

A copy of the Response, exhibit(s) and declaration(s) must be served upon:

(1) Movant's attorney (or Movant, if Movant does not have an attorney);
(2) the trustee; and
(3) the judge who presides over this bankruptcy case.

Then the document must be filed with the court.

1. ☐ **NONOPPOSITION**

The Respondent does not oppose the granting of the Motion.

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2014 Page 1 F 4001-1.RFS.RESPONSE

Main Document Page 2 of 100

2. ☐ **LIMITED OPPOSITION**

a. ☐ Respondent opposes the Motion only to the extent that it seeks immediate relief from stay. Respondent requests that no lock out, foreclosure, or repossession take place before (*date*): __________ and the reason for this request is (*specify*):

b. ☐ As set forth in the attached declaration of the Respondent or the Debtor, the motion is opposed only to the extent that it seeks a specific finding that the Debtor was involved in a scheme to hinder, delay or defraud creditors.

The Debtor:

(1) ☐ has no knowledge of the Property.
(2) ☐ has no interest in the Property.
(3) ☐ has no actual possession of the Property.
(4) ☐ was not involved in the transfer of the Property.

c. ☐ Respondent opposes the Motion and will request a continuance of the hearing since there is an application for a loan modification under consideration at this time. Evidence of a pending loan modification is attached as Exhibit _____.

3. ☒ **OPPOSITION:** The Respondent opposes granting of the Motion for the reasons set forth below.

a. ☐ The Motion was not properly served (*specify*):

(1) ☐ Not all of the required parties were served.
(2) ☐ There was insufficient notice of the hearing.
(3) ☐ An incorrect address for service of the Motion was used for (*specify*):

b. ☒ Respondent disputes the allegations/evidence contained in the Motion and contends as follows:

(1) ☐ The value of the Property is $ ____________________, based upon (*specify*):

(2) ☐ Total amount of debt (loans) on the Property is $ ____________________.

(3) ☐ More payments have been made to Movant than the Motion accounts for. True and correct copies of canceled checks proving the payments that have been made are attached as Exhibit _____.

(4) ☐ There is a loan modification agreement in effect that lowered the amount of the monthly payments. A true and correct copy of the loan modification agreement is attached as Exhibit _____.

(5) ☐ The Property is necessary for an effective reorganization. Respondent filed or intends to file a plan of reorganization that requires use of the Property. A true and correct copy of the plan is attached as Exhibit _____.

(6) ☐ The Property is fully provided for in the chapter 13 plan and all postpetition plan payments are current. A true and correct copy of the chapter 13 plan is attached as Exhibit _____ and proof that the plan payments are current through the chapter 13 trustee is attached as Exhibit _____.

(7) ☐ The Property is insured. Evidence of current insurance is attached as Exhibit _____.

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2014 Page 2 F 4001-1.RFS.RESPONSE

(8) ☐ Movant's description of the status of the unlawful detainer proceeding is not accurate.

(9) ☐ Respondent denies that this bankruptcy case was filed in bad faith.

(10) ☒ The Debtor will be prejudiced if the Nonbankruptcy Action is allowed to continue the nonbankruptcy forum.

(11) ☐ Other (*specify*):

c. ☒ Respondent asserts the following as shown in the declaration(s) filed with this Response:

(1) ☐ The bankruptcy case was converted from chapter ___ to chapter ___.

(2) ☐ All postpetition arrearages will be cured by the hearing date on this motion.

(3) ☐ The Property is fully provided for in the chapter 13 plan and all postpetition plan payments ☐ are current, or ☐ will be cured by the hearing date on this motion.

(4) ☐ The Debtor has equity in the Property in the amount of $ ____________________.

(5) ☐ Movant has an equity cushion of $ ____________________ or _______% which is sufficient to provide adequate protection.

(6) ☐ The Property is necessary for an effective reorganization because (*specify*):

(7) ☒ The motion should be denied because (*specify*):
See Memorandum of Points and Authorities and Supporting Declaration

(8) ☒ An optional memorandum of points and authorities is attached in support of this Response.

4. **EVIDENCE TO AUTHENTICATE EXHIBITS AND TO SUPPORT FACTS INSERTED IN THE RESPONSE:**

Attached are the following documents in support of this Response:

☒ Declaration by the Debtor
☐ Declaration by trustee
☐ Declaration by appraiser
☐ Declaration by the Debtor's attorney
☐ Declaration by trustee's attorney
☒ Other (*specify*): Declaration by Althea Azeff

Date: 11/24/2020

______________________________
Printed name of law firm for Respondent (if applicable)

Nicole Prause
Printed name of individual Respondent or attorney for Respondent

*Nicole Prause*
Signature of individual Respondent or attorney for Respondent

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2014 Page 3 F 4001-1.RFS.RESPONSE

Main Document Page 4 of 100

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

A true and correct copy of the foregoing document entitled: **RESPONSE TO MOTION REGARDING THE AUTOMATIC STAY AND DECLARATION(S) IN SUPPORT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) ___________, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) ___________, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ___________, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| ___________ | ______________________________ | ______________________________ |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2014* Page 4 **F 4001-1.RFS.RESPONSE**

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. PRELIMINARY STATEMENT

Movant Aaron Minc's, hereinafter "Movant", Relief from Stay Motion ("Motion") fails to demonstrate sufficient cause for relief from the automatic stay under 11 U.S.C. Section 362 (d)(1).

Due to COVID-19, the state court matters are currently delayed and trial dates cancelled and/or continued. Since the Movant has a pending adversary case against the Debtor and asserts in its Relief From Stay Motion that the issues are nondischargeable in nature, Movant himself acknowledges that the Bankruptcy Court is the best venue to hear and expeditiously resolve Movant's alleged claims against the Debtor. Movant's case is still in the early stages of litigation and not close to a final adjudication as there is a Motion for Leave to Amend Complaint filed on November 12, 2020 (see State Court Case Docket). As such, there is no prejudice to Movant to have the case litigated in the Bankruptcy Court rather than the State Court. In evaluating the *Curtis/Sonnax Factors*, Movant's Motion for Relief should be denied as Movant's unsecured claim will be most expeditiously resolved in the bankruptcy forum.

## II. LEGAL AUTHORITY AND ARGUMENTS

### A. Standard for Review Governing Motion for Relief From Stay.

Upon filing, the automatic stay prohibits the continuation of almost all judicial proceedings against the Debtor. *Gruntz v. County of Los Angeles (In re Gruntz)* (9th Cir. 2000) 202 F.3d 1074, 1081-82 (the automatic stay is "self-executing" and "sweeps broadly"). The automatic stay is designed to protect debtors from creditors while the debtor puts his financial affairs in order. *In re Schwartz* (9th Cir. 1992) 954 F.2d 569,571.

The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collections efforts, harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into

bankruptcy. *Benedor Corp. vs. Conejo Enters., Inc. (In re Conejo Enters. Inc.)* (9th Cir. 1990) 96 F/3d 346, 352. The automatic stay allows the debtor to focus its efforts on reorganization. *Truebro, Inc. v. Plumberex Specialty Prods, Inc. (In re Plumberex Specialty Prods, Inc.)* (Bankr. C.D. Cal. 2004) 311 B.R. 551, 556. In order to obtain relief from the automatic stay, a party seeking relief must establish "cause." 11 U.S.C. Section 362; *In re Universal Life Church,* (E.D. Cal. 1991) 127 B.R. 453, 455; *In re Plumberex.* 311 B.R. at 557 ("To obtain relief from the automatic stay, the party seeking relief must first establish a prima facia case that "cause" exists for relief under section 362(d)(1)."). "If the movant fails to meet its initial burden to demonstrate cause, relief from the automatic stay should be denied." *Id* at 557. "Because there is no clear definition of what constitutes 'cause,' discretionary relief from stay must be determined on a case by case basis." *MacDonald v. MacDonald (In re MacDonald)* (9th Cir. 1985) 755 F.2d 715, 716. "Cause" includes such factors as: (1) an interference with the bankruptcy; (2) good or bad faith of the debtor; (3) injury to the debtor and other creditors if the stay is modified; (4) injury to the movant if the stay is not modified; and (5) the relative balance of the harms from modifying or continuing the stay. *GSB I, LLC v. A Partners, LLC (In re A Partners, LLC)* (Bankr. E.D. Cal. 2006) 344 B.R. 114.

Movant fails to demonstrate sufficient cause for relief from the automatic stay under 11 U.S.C. Section 362 (d)(1).

### B. Creditor Failed to Demonstrate Sufficient Cause to Lift the Stay

Movant addressed only four of the twelve Curtis factors in seeking relief from stay. None of the four support his motion for relief from stay. Those eight excluded provide additional evidence that the Motion should be DENIED.

**(1) the lack of any connection with or interference with the bankruptcy case;**

Movant's complaint is connected to Debtor's bankruptcy case, as it is effectively a claim in the Debtor's case and is subject of a pending Adversary Case filed by Movant against the Debtor. Movant can more expeditiously resolve the case in the bankruptcy forum through the pending Adversary Case. This factor supports DENIAL of the relief sought by Movant.

**(2) whether relief will result in a partial or complete resolution of the issues;**

Allowing the State Court complaint to move forward would not result in a complete resolution of the issues as Movant would still need to relitigate all of the nondischargeable claims in the Bankruptcy Court. Movant and Debtor would need to go through two trials, when they can expeditiously accomplish the final result in the Bankruptcy Court without spending additional legal fees to litigate the state court case. This factor supports DENIAL of the relief sought by Movant.

**(3) the interests of judicial economy and the expeditious and economical determination of litigation for the parties;**

The issues alleged by Movant against Dr. Farmer are not inextricably intertwined. Movant alleged that Dr. Farmer "tagged" ethics boards and introduced commentary not a part of debtor's statements in his filing. Dr. Farmer already has responded and her filing agrees that her statements are independent of those of debtor. The courts should not be linked in these cases to ensure the courts are free to reach different judgements appropriate to the different facts in the cases.

Movant already is coordinating with parties in California courts. His client Alexander Rhodes was a competitive creditor in the debt hearing, yet they did not have separate counsel. It is unclear whether Movant was violating his requirements not to act in opposition to his client's interest by failing to differentiate his creditor claims from his client's creditor claims.

Further, Movant alleges that Ohio law should prevail "arising from conduct targeted to an Ohio Audience". Yet, Movant Minc does not allege that Prause made any statement mentioning the state of Ohio. Prause has no personal or business contacts in Ohio, much less any that rise to a standard of minimum contact that would support an Ohio jurisdiction (see Statement of Nicole Prause, PhD). Further, both Ohio and California offer identical claims (e.g., Defamation) to those alleged by Movant, thus Movant would not be deprived of any claims in California.

Further, Movant alleges that Debtor's acts were "malicious and intentional". Movant provides no evidence or argument that Debtor acts were intentionally malicious or defamatory. In fact, debtor filed a report with the Los Angeles Police Department following the disclosure of her physical address by Minc's law firm ("Criminal Threats" to LAPD report #3392). The "Declaration of Nicole Prause, PhD" details these threats to her safety by Aaron Minc's firm. Althea Azeff is Alexander Rhode's mother. She also provides a statement describing Minc's client's history of physical violence and the malicious prosecution encouraged by Minc's firm (see "Declaration of Althea Azeff").

To prevail, Movant attempts to argue the merits of his claims, but there is no evidence he would be entitled to injunctive relief. Dragging a bankrupt debtor into another state with which they have no contact to fend off malicious prosecution disadvantages the debtor. The Motion should be DENIED.

**(4) the impact of the stay on the parties.**

Movant alleges that he will be required to litigate "the same case" in different states without a relief from stay. In reality, the case with Dr. Farmer and his fraudulent claims against Dr. Prause share minimal facts, as outlined by Dr. Farmer's response (see Exhibit A). For example, debtor does not allege that the Ohio ethics board should review Movant unethical behaviors, whereas

Dr. Farmer does. Movant claims his "costs and time expenditure will be more than doubled". If he must prepare completely different filings, Movant admits that the facts are entirely different between the two cases if he cannot simply file largely the same/similar suit against debtor.

Movant alleges that Dr. Prause will receive insurance funds in the event there is a findings against her in the case. This is false. Movant alleges that Dr. Prause's actions are "malicious", which is required to escape bankruptcy; yet, debtor's insurance specifically excludes coverage of "malicious" claims (see Exhibit B). Further, the acts are clearly not malicious, but truth (see Declaration of Nicole Prause, PhD). No insurance funds will be available to Movant for his claims. The Debtor will be harmed by having to expend additional resources defending herself in the State Court Action.

The Movant dismissed the eight other Curtis factors as "not at issue and, therefore, weigh in favor of granting relief". On the contrary, to the extent these factors are relevant, they support DENIAL of the Motion:

**(5) whether the foreign proceeding involves the debtor as a fiduciary;**

The factor appears irrelevant in this case.

**(6) whether a specialized tribunal has been established to hear the particular cause of action and whether that tribunal has the expertise to hear such cases;**

No specialized tribunal has been assembled, which supports DENIAL of movant's motion.

**(7) whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation;**

Debtors insurance has already stated in writing that they will deny coverage for the allegations of the Movant. To the extent other Defendants who are not connected to the Debtor's bankruptcy

are named in the state court complaint. Movant is free to pursue those Defendants and recover from those Defendants. This supports DENIAL of Movant's motion.

**(8) whether the action involves third parties and the debtor functions only as a bailee or conduit for the goods or proceedings in question;**

Movant's state court complaint names one defendant. The case is against Dr. Melissa Farmer for statements not made and agencies not contacted by Debtor. The debtor may not be attached as a bailee for movant claims against Dr. Farmer. This supports DENIAL of Movant's motion.

**(9) whether litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties',**

Movant is a creditor in opposition to creditor Alexander Rhodes and coordinating with parties in creditor Donald Hilton. Movant already has acted in opposition by attempting to gain monies from the debtor which his firm previously alleged actually were due to Alexander Rhodes. With these cases in the same hearing, such abuse is easy to monitor, catch, and defend. By splitting the cases, debtor is forced to fully inform multiple states about malfeasance from these interrelated cases. This supports DENIAL of Movant's motion.

**(10) whether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c);**

The factor appears irrelevant in this case.

**(11) whether the movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 52249; and**

The factor appears irrelevant in this case.

**(12) whether the foreign proceedings have progressed to the point where the parties are prepared for trial.**

Dr. Farmer who has just filed her first response to the movant for dismissal (see Exhibit A). There is no need to join Dr. Prause at a stage where the malicious lawsuit remains likely to be dismissed before proceeding further. Further, Dr. Farmer has asserted a "truth" defense, which will allow her to avail her of anti-SLAPP motions, if needed, that the Movant's claims cannot survive (see Declaration of Nicole Prause, PhD).

Movant alleges that "Notably, courts have held that the moving party need not show that their claims are likely to prevail in state court litigation". Notably, the movant's claim has not reached any debate on merits, where it will fail. Rather, Movant's claims represent a continuation of harassment coordinated with other creditors to silence the debtor and enrich his firm (see Declaration of Nicole Prause, PhD).

## III. CONCLUSION

Debtor respectfully requests that this Court deny Movant's Motion for Relief From the Automatic Stay with prejudice and for any other relief deemed necessary and proper.

DATED: November 24, 2020

By: /s/ Nicole Prause

Nicole Prause

STATE OF CALIFORNIA §
§
COUNTY OF LOS ANGELES §

Declaration of Nicole Prause, PhD

1. My name is Nicole Prause. I have a PhD in clinical science, which I received from Indiana University, Bloomington, summa cum laude, in 2007. I completed a research fellowship in addictions at Harvard University. I conduct federally-funded and -regulated Biosafety-II laboratory research as a neuroscientist and practice as a Psychologist licensed in California (#27778). I have been unable to collect data as a neuroscientist since COVID-19 regulations closed my laboratory in March 2020. I am also an unpaid consultant to the World Health Organization.

2. One of my areas of study is the effects of pornography on humans. The USA is unique in the world for its vitriolic attacks on scholars who study in this area. Numerous scholars and their families have had to seek protection from law enforcement due to violent threats and stalking from these activists (see Exhibit C). I was nominated for the Maddox Prize in science communication last year for the safety threats and lawsuits I faced just for trying to communicate science to the public.

3. I have received over 50 death and rape threats within the last 8 years. I have reported them to law enforcement. I am currently enrolled in the address protection program in California, known as Safe At Home, due to stalking (see Exhibit D). I have filed 14 FBI and 3 LAPD reports to try to protect myself and my family. A majority of the death threats arose directly in response to Alexander Rhodes posting my full name on his websites, including defamatory claims that I am in the pornography industry (see below). I have never received any support of any kind from any pornography organization, which Alexander Rhodes knew at the time he posted those statements with Minc firms' support (see below).

4. Aaron Minc's law firm represents Alexander Rhodes. I believe that I will be murdered by Minc's client Alexander Rhodes. I believe that the actions of Aaron Minc and his firm incite violence against me.

5. Alexander Rhodes posted series of frightening claims to over 25,000 followers beginning "I believe that Dr. Prause is evil" (see Exhibit E). Rhodes subsequently deleted these in an effort to hide them from the court. Rhodes then perjured himself in court in PA, lying that he had never posted my name.

6. As a result of those frightening threats, I became very concerned when Minc's client Rhodes posted that a "big announcement" was coming and closed his website. My counsel contacted Minc's firm and warned them not to post my name. Minc's firm lied, telling my counsel "your clients are not referenced by name" (see Exhibit F). My full name and address were then posted by their client, Alexander Rhodes.

7. This resulted in a barrage of rape and death threats against me over dozens of platforms and websites, continued from earlier death threats citing Rhodes as inspiration to murder me (see Exhibit E).

8. In his post, Rhodes begged for money to sue "the porn industry" and lied that I represented the pornography industry. I have never received any support of any kind ever from any part of the pornography industry, which Rhodes knew when he enriched himself defaming me. The fundraiser was reposted 35 times on Reddit, dozens of times on document websites, blasted on listservs, posted on anti-semitic, violent media including 4chan, and more. I was forced to relocate yet again for safety.

9. Alexander Rhodes enriched himself over $156,000 USD by lying that I was in the porn industry (see Exhibit G).

10. I filed a complaint with the charity fraud commission in Pennsylvania. I included examples of over 200 donors who were misled to believe that they were donating for a lawsuit to sue "the porn industry". Alexander Rhodes has never filed any lawsuit against the porn industry to my knowledge.

11. Since Rhodes never filed any lawsuit against the pornography industry, I believe that Minc's firm is being paid to sue me with these laundered funds.

12. Althea Azeff is an attorney and Alexander Rhodes' mother. Ms. Rhodes reported witnessing Alexander Rhodes travel across the country to Los Angeles, where he knew I lived, with a gun and body camera. She said he stated his intention was to find me and "confront" me, possibly by murdering me on video. Ms. Azeff contacted myself and my attorney, William Pentecost. Ms. Azeff was interviewed by our investigator to verify her identity. Ms. Azeff has offered to testify under oath, and provided a statement describing her fears of Alexander Rhodes (see Declaration of Althea Azeff). Ms. Azeff also states that the fundraiser is fraudulent.

13. Around July 25, 2020, I discovered that Minc's law firm had received my physical address weeks before from the University of Pittsburgh as a part of their discovery. They failed to turn over the documents for weeks, despite multiple emails and calls requesting same. Minc's firm was actively negotiating a protective order with my attorney, William Pentecost, to prevent exactly this from happening. A protective order is now in place for discovery documents in that case.

14. My public post regarding Aaron Minc's firm was the truth. I did report Minc's law firm to LAPD. I believe the LAPD is still investigating and has served two subpoenas.

15. Aaron Minc emailed my attorney William Pentecost to threaten him for my Twitter posts July 30, 2020 (see Exhibit H). I was in the middle of moving my home and office again, due to the renewed threats to my safety by Aaron Minc's firm and clients. Although my posts were true, I chose to remove them because I know they file malicious litigation for harassment and advertising. Minc's firm wrote that the matter was closed on August 12, 2020 ("attack on our firm has been addressed"), so I assumed it was (see Exhibit I).

16. Gary Wilson has posted Aaron Minc's lawsuit repetitively, claiming I am "convicted" and a "criminal". Gary Wilson, with the documents given to him by Aarons Minc, has posted these on his Twitter accounts @YourBrainOnPorn, @speak_justice, and @RealYBOPexposed accounts and

websites www.yourbrainonporn.com, www.realyourbrainonporn.exposed and www.pornstudycritiques.com (see Exhibit J).

17. Gary Wilson had posted the full filing of the lawsuit on September 9, 2020 on his website www.yourbrainonporn.com, before it was available through the courts. Gary Wilson could only have received this document from Aaron Minc (see Exhibit K). Meta-data from the pdf support that the pdf posted by Gary Wilson was delivered by Aaron Minc. Also, I was not named in the action, so a search for my name would not have returned the documents.

18. I believe that Aaron Minc knew, by providing his malicious prosecution to Gary Wison, he could depend on Gary Wilson to harass and threaten me. Gary Wilson is widely known for having threatened the safety of women and scholars all over the world (see Exhibit C).

19. I believe Aaron Minc is using his lawsuit solely for harassment and to promote his "brand". Minc is using my name to "advertise" his law firm.

20. Aaron Minc stated in his Ohio complaint Sept 9, 2020 "Plaintiff is in the process of obtaining leave from the Bankruptcy Court to include her as a defendant in this lawsuit.", which he then failed to do for months. Minc never provided service to me, but was colluding with other creditors in California. This appears most consistent with malicious prosecution.

21. I added Aaron Minc as a creditor on October 12, 2020 (see Exhibit L), despite never receiving timely service of his claim.

22. Although Aaron Minc's claims that my acts were "malicious" are patently false, he has guaranteed no insurance coverage would be available to him. My professional liability insurance explicitly does not cover claims that are "malicious".

23. Dr. Farmer already has filed for dismissal of Minc's malicious prosecution in Ohio (see Exhibit A).

24. I am aware that Aaron Minc is a limited public figure. National news described (see Exhibit M) Aaron Minc's coworker Pierre Zarokian pleading guilty to felony conspiracy (see Exhibit N). The felony was described as "hacking" reputation websites to remove negative reviews for a fee.

25. I have become aware of other allegations of criminal allegations against Aaron Minc's firm including that Minc is making backdoor deals with "reputation" websites. They describe that he does not inform his clients of these negotiations, charging them removal fees for same (see Exhibit O). I have no knowledge about the accuracy of those claims, but they suggest a pattern of behavior consistent with his filing a lawsuit for the purposes of harassment.

EXECUTED on October 24, 2020.

Nicole Prause

Nicole Prause, Ph.D.

# Exhibit A

**IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO**

| | | |
|---|---|---|
| AARON M. MINC, ESQ. | ) | CASE NO. CV 20 937026 |
| | ) | |
| *Plaintiff,* | ) | JUDGE EMILY HAGAN |
| | ) | |
| vs. | ) | |
| | ) | |
| MELISSA A. FARMER | ) | |
| | ) | |
| *Defendant.* | ) | |

**DEFENDANT'S MOTION TO DISMISS**

Now comes Defendant, MELISSA A. FARMER (hereinafter "Defendant" or "Dr. Farmer"), by and through counsel, pursuant to Civil Rule 12, and moves to dismiss the *Complaint for Defamation and False Light* filed by Plaintiff, AARON M. MINC, ESQ. (hereinafter "Plaintiff" or "Mr. Minc").

Defendant's reasons in support of this motion to dismiss are more fully set forth in the attached *Memorandum in Support*, which is incorporated herein by reference.

Respectfully submitted,

*/s/ Joseph J. Triscaro*
Joseph J. Triscaro (#0081209)
TRISCARO & ASSOCIATES, LTD.
6325 Cochran Road, Suite 8
Solon, Ohio 44139
Tel: (440) 248-8811
Fax: (440) 248-1599
jtriscaro@triscarolaw.com

*Attorney for Defendant
Melissa A. Farmer*

**MEMORANDUM IN SUPPORT**

I. **ALLEGATIONS OF THE COMPLAINT**

On September 9, 2020, Plaintiff filed a *Complaint for Defamation and False Light* against Defendant. Plaintiff's Complaint alleges that his law firm currently represents a third party against a California resident, Nicole. R. Prause ("Prause"). (Compl. at ¶¶3, 6). Prause is not a party to the instant lawsuit. On or about July 28, 2020, Prause published a series of tweets stating that she feared for her safety because Plaintiff had directly sent Prause's home and work address to a group of people that have been threatening to kill her for years. *Id.* at 7. Plaintiff's Complaint further alleges that Defendant republished (also known as retweeting) Prause's tweets and directly messaged and/or shared them with the Ohio State Bar Association, Cleveland Metropolitan Bar Association and the Ohio Supreme Court's twitter accounts. *Id.* at 12. The Complaint also alleges that Defendant's tweet claimed that Plaintiff was "engaging in ethics violations that endanger [a] third party (Ohio Rules of Prof. Conduct 4.4)." *Id.* at 13.

Based upon such allegations, Plaintiff is pursuing claims against Defendant for libel (known as defamation in Ohio) and libel per se (Count 1) and false light (Count 2).

II. **LAW AND ARGUMENT**

A. **Grounds for dismissal.**

Rule 12(B)(6) of the Ohio Rules of Civil Procedure requires dismissal based on a plaintiffs "failure to state a claim upon which relief can be granted." A 12(B)(6) motion tests "the sufficiency of the complaint." *Bradigan v. Strongsville City Schools*, 2007-Ohio-2773, 2007 WL 1643191, 12 (8th Dist. 2007). Dismissal is proper under Rule 12(B)(6) when, after presuming the truth of all material factual allegations in the complaint, it appears beyond doubt

2

that the plaintiff can prove no set of facts warranting relief. *See, e.g., State ex rel. Hummel v. Sadler*, 96 Ohio St. 3d 84, 87 (2002); *Taylor v. London*, 88 Ohio St. 3d 137, 139 (2000). While Ohio is a notice pleading state, a Complaint "must still advance a rational basis for holding defendant liable." *City of Cleveland v. JP Morgan Chase Bank*, 2013-Ohio-1035, 2013 WL 1183332, 11 (8th Dist. 2013). The Complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... Factual allegations must be enough to raise a right to relief above the speculative level." *Gallo v. Westfield Nat'l Ins. Co.*, 2009-Ohio-1094, 2009 WL 625522, 9 (8th Dist. 2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

Where, as here, a defamation complaint is based upon a publication attached to the complaint, the court may properly consider the publication as part of the pleadings when evaluating a motion to dismiss under Rule 12(B)(6). *See Vail v. The Plain Dealer Publishing Co.*, 72 Ohio St. 3d 279, 282-283 (1995) (considering newspaper columns); *see also Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999) (documents attached to complaint are considered part of the pleadings "if they are referred to in plaintiff's complaint and are central to the plaintiff's claim").

Civ.R. 12(B)(2) permits dismissal where the trial court lacks jurisdiction over the person. In determining whether it has personal jurisdiction over an out-of-state defendant, a court must engage in a two-step inquiry: first, the court must determine whether the defendant's conduct falls within Ohio's "long-arm" statute or the applicable civil rule, and if it does, then the court must determine whether the assertion of jurisdiction over the nonresident defendant would deprive the defendant of due process under the Fourteenth Amendment to the United States Constitution. *Goldstein v. Christiansen*, 70 Ohio St 3d 232, 235 (1994).

Civ.R. 12(B)(7) permits dismissal where the plaintiff failed to join a party under Civ.R. 19 or 19.1. Civ.R. 19(A) delineates the joinder of persons needed for adjudication, if feasible. It provides, in relevant part, "[a] person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties[.]" Section (B) further provides if a person as described in subdivision (A)(1), (2), or (3) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable.

B. **The Complaint fails to state a claim for defamation.**[1]

To establish a claim for defamation, Plaintiff must demonstrate that: (1) Defendants made a false statement of fact; (2) the statement was defamatory; (3) the statement was published; (4) Plaintiff suffered injury as a result of the publication; and (5) Defendants acted with the required degree of fault in publishing the statement. *See Great Lakes Capital Partners, Ltd. v. Plain Dealer Publishing Co.*, 2008-Ohio-6495, 17 (8th Dist. 2008) (reciting elements of defamation); *see also Williams v. Gannett Satellite Information Network, Inc.*, 162 Ohio App. 3d 596, 598-99 (1st Dist. 2005) ("In order to survive a motion to dismiss, [the plaintiff] had to allege the elements of defamation: (1) a false and defamatory statement concerning [the plaintiff], (2) publication of the statement, (3) fault, and (4) harm."). Whether a publication is defamatory, or is capable of being interpreted as defamatory, are questions of law for the court. *Moore v. P.W. Publishing Co.*, 3 Ohio St. 2d 183 (1965), cert. denied, 328 U.S. 978 (1966); *see*

---

[1] Referred to as libel and libel per se in Plaintiff's Complaint.

*also Early v. The Toledo Blade*, 139 Ohio App. 3d 302, 320-21 (6th Dist. 1998) (citing *Yeager v. Local Union* 20, 6 Ohio St. 3d 369, 372 (1983)).

Plaintiff cannot satisfy those elements herein, and his Complaint should be dismissed with prejudice for the following reasons.

1. **The alleged defamatory publication is true.**

A threshold element for any defamation claim is falsity, and truth is an absolute defense. *Shifflet v. Thomson Newspapers*, 69 Ohio St. 2d 178, 183 (1982). Plaintiff's burden is to allege and prove material falsity, i.e., that there is a substantial difference in some material respect between the complained of language and the truth. *Bruss v. Vindicator Printing Co.*, 109 Ohio App. 3d 396 (7th Dist. 1996); *Saferin v. Malrite Commc'ns Grp., Inc.*, No. L-99-1193, 2000 WL 299454, *3 (6th Dist. 2000) ("Material falsity is an essential element of defamation."). Literal truth is not required; a publication is not actionable if it is fairly accurate or substantially true. *National Medic Services v. E. W. Scripps Co.*, 61 Ohio App. 3d 752, 755 (1st Dist. 1989). Plaintiff cannot meet his burden of demonstrating material falsity as a matter of law.

Plaintiff's defamation claim is based upon Defendant's retweet of third party tweet providing that an Ohio lawyer was engaging in ethics violations that endanger a third party under Ohio Rule of Professional Conduct 4.4, which provides:

**RULE 4.4: RESPECT FOR RIGHTS OF THIRD PERSONS**

> (a) In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, harass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.
>
> (b) A lawyer who receives a document or electronically stored information relating to the representation of the lawyer's client and knows or reasonably should know that the document or electronically stored information was inadvertently sent shall promptly notify the sender.

In the instant matter, Prause tweeted that "[y]ou can ask [Plaintiff] why he just sent my physical location to this group that offered to kill me multiple times." Defendant merely re-tweeted such statement to certain professional organizations with the statement that "Ohio lawyer @RepLawyer engaging in ethics violations that endanger third party (Ohio Rules of Prof Conduct Rule 4.4)."

First, it needs to be noted that the statement regarding Plaintiff providing Prause's physical location to a group that offered to kill her was not a statement made by Defendant, and is thus not actionable against Defendant.

Second, Defendant's statement is true. If indeed, Plaintiff, who currently represents a third party in a lawsuit against Prause, did provide Prause's address to an organization that has offered to kill Prause, it could be considered a violation of Ohio Rule of Professional Conduct 4.4 inasmuch as such action could be considered means that have no substantial purpose other than to harass, delay, or burden Prause. Consequently, any defamation claim against Defendant herein is barred due to the truth defense.

2. **The common interest privilege bars Plaintiff's defamation claim.**

The common interest privilege provides a second, independent basis to dismiss Plaintiff's defamation claims. It is well-settled that a communication made by a person who has an interest or a duty to make the communication, to another person who has a corresponding interest in the communication, is privileged. In *Hahn v. Kotten*, 43 Ohio St. 2d 237 (1975), the Ohio Supreme Court established what is known as the "common interest" privilege." The court in Hahn defined the privilege as follows:

> A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even

6

> though it contains matters which, without the privilege, would be actionable, and although the duty is not a legal one, but only a moral or social duty of imperfect obligation.

*Id.* at 246.

Thus, the Ohio Supreme Court recognizes that certain communications arising out of a moral or ethical obligation are, as a matter of public policy, encouraged and protected. The common interest privilege has developed to allow people to fulfill these moral obligations without fear of legal retribution, and it applies here.

Melissa Farmer is a clinician-scientist with roots in sexology, pain research, and neuroscience. (Compl. at ¶2). She has a PhD in clinical psychology. *Id.* As a professional, Dr. Farmer has an interest to protect women from wrongful conduct. In the instant matter, Prause re-published a third party tweet providing that an attorney had disclosed Prause's address to a group that had offered to kill her. Seeing a wrong, Dr. Farmer felt like she had a duty to disclose such information to certain professional organizations that govern attorneys. Such conduct is protected by the common-interest privilege, and therefore, Plaintiff's defamation claim should be dismissed.

3. **The tweet is constitutionally protected opinion**

Article 1, Section 11 of the Ohio Constitution guarantees every citizen the right to publish freely his or her sentiments on all subjects. *Wampler v. Higgins*, 93 Ohio St. 3d 111 (2001). Thus, the Ohio Constitution provides an absolute privilege for expressions of opinion, and it requires trial courts to make categorical determinations in every defamation case as to whether an allegedly defamatory statement is a non-actionable statement of opinion or a statement of fact. *Id.* at 122; see also ***Vail***, 72 Ohio St. 3d 279; *Scott v. News-Herald*, 25 Ohio St. 3d 243, 250 (1986).

Determining whether a statement is one of fact or opinion requires a consideration of the totality of the circumstances, with the Court analyzing the following factors: (1) the specific language used; (2) whether the statement is verifiable; (3) the general context of the statement; and (4) the broader context in which the statement appears. *Vail*, 72 Ohio St. 3d at 282 (citing *Scott*, 25 Ohio St. 3d at 250); *see also Ferreri*, 142 Ohio App. 3d 629. The opinion privilege applies when the facts underlying the opinion are disclosed and there is no implication that the speaker has firsthand knowledge of undisclosed facts to support the opinion. *Vail*. 72 Oho St. 3d at 283; *Worldnet Software Co. v. Gannett Satellite*, 122 Ohio App. 3d 499, 505-06 (1st Dist. 1997).

Application of the test is fluid, and the weight given to any one factor will necessarily vary depending on the circumstances of each case. *See Vail*, 72 Ohio St. 3d at 282; *Ferreri*, 142 Ohio App. 3d at 639. This analysis is not a bright line test, but does establish parameters within which each statement or utterance may stand on its own merits rather than be subjected to a mechanistic standard. "The totality of the circumstances test...can only be used as a compass to show general direction and not a map to set rigid boundaries." *Vail*, 72 Ohio St. 3d at 282 (quoting *Scott v. News-Herald*, supra).

Here, the specific language used weighs in favor of finding the tweet to be a statement of opinion. Defendant is retweeting a statement made by a third party with an opinion that Plaintiff violated Ohio Rule of Professional Conduct 4.4.

The inclusion of Ohio Rule of Professional Conduct 4.4 in the tweet does not transform it from opinion into a factual statement. "It is the language of the entire article, and not a single factual reference, that determines whether an article is fact or opinion." *Sikora v. Plain Dealer Publishing Co.*, 2003-Ohio-3218, 19 (8th Dist. 2003) (citing *Ferreri*, 142 Ohio App. 3d at 640;

*DeVito v. Gollinger*, 133 Ohio App. 3d 51, 55 (8th Dist. 1999)) (language of entire publication may signal that a "specific statement which, sitting alone. would appear to be factual is in actuality a statement of opinion."). There are numerous examples of cases where a publication is determined to be constitutionally protected opinion despite the presence of factual assertions much more direct and specific than anything found in the tweet here. *See, e.g., Jorg v. Cincinnati Black United Front*, 153 Ohio App. 3d 258 (1st Dist. 2003) (statement that the plaintiff killed an unarmed person was statement of opinion in spite of the factual and verifiable nature of the language used); *Cooke v. United Dairy Farmers, Inc.*, 2005-Ohio-1539 (10th Dist. 2005) (statement that the plaintiff's actions were part of an unethical and illegal scheme was opinion).

The verifiability factor also weighs in favor of a determination that the tweet here contains statements of opinion. "[I]t is the conclusions that are drawn from any factual references that epitomize the classification as fact or opinion." *Sikora*, 2003-Ohio-3218, at 20. The conclusions drawn in the tweet are that because of Plaintiff's disclosure of Prause's address to a group that want to kill her, that Plaintiff has violated a rule of professional conduct. Those conclusions are unverifiable statements of opinion intended to give guidance to others.

Finally, both the general and broader context of the communication support a finding of constitutionally-protected opinion. The general context factor requires an analysis of the entire publication. *Bentkowski v. Scene Publishing*, 637 F.3d 689, 695 (6th Cir. 2011). While there is factual content in the tweet, it is clear that its main purpose is to convey the opinion that, based on the allegations that have been made, it is the opinion that Plaintiff engaged in unethical conduct.

The broader context of the communication requires an examination of the times we live in. Defendant believes she has a responsibility to protect other women. Given the information published about Prause, Defendant had a moral duty to be proactive and alert others.

C. **Plaintiff can prove no set of facts entitling him to relief for false light invasion of privacy.**

Plaintiff cannot state a viable claim for false light. The Ohio Supreme Court defines that claim as follows: "[O]ne who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for an invasion of privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Welling v. Weinfeld*, 113 Ohio St. 3d 464, 473 (2007). Thus, as with Plaintiff's defamation claim, falsity is a threshold element of his false light claim and "[f]alse-light defendants enjoy protections at least as extensive as defamation defendants." *Id.* at 472. Truth is an absolute defense to Plaintiff's false light invasion of privacy claim and, as demonstrated above, the tweet at issue is substantially true and, therefore, supports neither a claim for defamation nor false light invasion of privacy. For that reason alone, the false light claim (Count 2) should meet the same fate as the defamation claims - dismissal with prejudice.

Additionally, false light is an invasion of privacy tort intended to redress the improper disclosure of private matters. *Murray v. Chagrin Valley Publishing Co.*, 2014-Ohio-5442, 39 (8th Dist. 2014). Conduct that has been previously reported by third parties can no longer be said to be a private matter. Since Plaintiff's conduct was previously published by Prause it is no longer private. This provides an alternative basis for dismissal of Count 2.

D. **This Court lacks personal jurisdiction over Defendant.**

Defendant is an Illinois resident and does not have sufficient minimum contacts with the State of Ohio. A court must have personal jurisdiction over a defendant in order to hear and determine an action. *Maryhew v. Yova* (1984), 11 Ohio St.3d 154, 156, 11 OBR 471, 464 N.E.2d 538. The determination of whether the court has personal jurisdiction over a nonresident defendant involves a two-step process. "[T]he court is obligated to (1) determine whether the state's long-arm statute and the applicable Civil Rule confer personal jurisdiction, and if so, (2) whether granting jurisdiction under the statute and rule would deprive the defendant of the right to due process of law pursuant to the Fourteenth Amendment to the United States Constitution." *U.S. Sprint Communications Co., Ltd. Partnership v. Mr. K's Foods, Inc.* (1994). 68 Ohio St.3d 181, 183-184, 624 N.E.2d 1048, 1051.

R.C. 2307.382, enumerates specific conduct that gives rise to personal jurisdiction, specifically:

> (A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:
>
> (1) Transacting any business in this state;
>
> (2) Contracting to supply services or goods in this state;
>
> (3) Causing tortious injury by an act or omission in this state;
>
> (4) Causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;
>
> (5) Causing injury in this state to any person by breach of warranty expressly or impliedly made in the sale of goods outside this state when he might reasonably have expected such person to use, consume, or be affected by the goods in this state, provided that he also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;

(6) Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state;

(7) Causing tortious injury to any person by a criminal act, any element of which takes place in this state, which he commits or in the commission of which he is guilty of complicity;

(8) Having an interest in, using, or possessing real property in this state;

(9) Contracting to insure any person, property, or risk located within this state at the time of contracting.

Defendant does not meet any of the foregoing requirements under Ohio's long-arm statute. Moreover, granting jurisdiction under the statute and rule would deprive the Defendant of the right to due process of law pursuant to the Fourteenth Amendment.

A state may exercise jurisdiction over an out-of-state defendant only if the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Internatl. Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940). The concept of minimum contacts protects the nonresident defendant from the burdens of litigating in distant or inconvenient forums and ensures that states do not encroach upon each other's sovereign interests. *U.S. Sprint Communications Co. Ltd. Partnership v. Mr. K's Foods, Inc.*, 68 Ohio St.3d 181, 186, 624 N.E.2d 1048 (1994), citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

To satisfy the minimum-contacts requirement, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). The mere allegation of

intentional tortious conduct which has injured a forum resident does not, by itself, satisfy the purposeful availment prong. *Air Prods. & Controls, Inc. v. Safetech Internatl., Inc.*, 503 F.3d 544, 552 (6th Cir. 2007); *Walden v. Fiore*, 571 U.S. 277, 290, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014) ("mere injury to a forum resident is not a sufficient connection to the forum," rather "[t]he proper question is … whether the defendant's conduct connects him to the forum in a meaningful way"). Defendant has not purposefully availed herself of the privilege of conducting activities within Ohio, and therefore has not satisfied the minimum contacts requirement. Defendant has no contacts with the State of Ohio.

Lastly, when a defendant moves to dismiss a case for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper. *Fraley v. Estate of Oeding*, 138 Ohio St.3d 250 (2014). Plaintiff will be unable to establish such burden in this matter.

Based upon the foregoing, this Court lacks personal jurisdiction over Defendant, and thus, Plaintiff's Complaint should be dismissed.

E. **Plaintiff has failed to join an indispensable party.**

As set forth above, Civ.R. 12(B)(7) permits dismissal where the plaintiff failed to join a party under Civ.R. 19 or 19.1. Civ.R. 19(A) delineates the joinder of persons needed for adjudication. It provides, in relevant part, "[a] person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties[.]" Section (B) further provides if a person as described in subdivision (A)(1), (2), or (3) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable.

In the instant case, the individual that made the alleged defamatory tweet, Prause, is not a party to this action. Nonetheless, Plaintiff is pursuing claims against Defendant based upon Prause's statement. Since the person that is alleged to have made the subject defamatory statement is not a party to this action, dismissal under Civ.R. 12(B)(7) is proper. It is fundamentally unfair, and Defendant will be substantially prejudiced, should Plaintiff be permitted to proceed against Defendant only. Prause is an indispensable party necessary for just adjudication of this matter.

## II. CONCLUSION

For all of the foregoing reasons, Plaintiff's *Complaint for Defamation and False Light* should be dismissed in its entirety with prejudice.

Respectfully submitted,

*/s/ Joseph J. Triscaro*

Joseph J. Triscaro (#0081209)
TRISCARO & ASSOCIATES, LTD.
6325 Cochran Road, Suite 8
Solon, Ohio 44139
Tel: (440) 248-8811
Fax: (440) 248-1599
jtriscaro@triscarolaw.com

*Attorney for Defendant Melissa A. Farmer*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served via the Court's electronic filing system this 12th day of November, 2020, to the following:

Aaron M. Minc, Esq.
Minc LLC
200 Park Ave., Suite 200
Orange Village, Ohio 44122
aminc@minclaw.com

*/s/ Joseph J. Triscaro*
Joseph J. Triscaro (#0081209)
TRISCARO & ASSOCIATES, LTD.

Exhibit B

# CIPRIANI & WERNER

A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

WILLIAM B. PENTECOST, JR.
wpentecost@c-wlaw.com

Direct Dial: (412) 254-9293

Also Admitted in New Jersey

Suite 700
650 Washington Road
Pittsburgh, Pennsylvania 15228

Telephone: (412) 563-2500
Fax: (412) 563-2080

www.C-WLAW.com

A Mid Atlantic Litigation Firm

Visit us online at
www.C-WLAW.com

November 17, 2020

**Via Email: astebbins@minclaw.com**
Andrew Stebbins, Esq.
Minc LLC
200 Park Avenue, Suite 200
Orange Village, OH 44122

Re: ***Alexander Rhodes v. Nicole Prause and Liberos LLC***
**Docket No.: 2:19-cv-01366 (USDC – Western District of PA)**
**Our File No.: 1182-70931P**

Dear Andrew:

As you requested, I am enclosing herewith a copy of reservation of rights letter regarding the policy of insurance under which I am representing Dr. Prause in the above-captioned matter.

You had indicated that you were going to communicate a demand to settle this matter. Please give me a call to discuss when you have a few minutes. Thank you.

Very truly yours,

William B. Pentecost, Jr.

WBP/ram

Enclosure

bcc: Nicole Prause, Ph.D.
***Via Email: nicole.prause@gmail.com***
Ms. Rosa Marques - Claim No. KY19K2801898-A
***Via Email: Rosa.Marques@chubb.com***

PENNSYLVANIA • NEW JERSEY • NEW YORK • DELAWARE • MARYLAND • WASHINGTON, DC • VIRGINIA • WEST VIRGINIA • GEORGIA

B. **Defense Will Be Provided Under the Policy.** As noted above, the Policy imposes on Chubb a duty to defend covered matters. Along these lines, we are pleased to advise that Chubb will defend you and Liberos LLC in this matter subject to this reservation of rights. As you know, we have assigned Phillip Sbrolla, Esq. of Cipriani & Werner to represent you in this matter.

C. **Potential Coverage Issues.** At present, we know very little about this claim aside from what is alleged in the Complaint. As this case proceeds, however, additional facts and/or defenses may be developed which may eliminate, raise or have an impact on existing coverage issues. Should this occur, we will forward a supplemental letter advising of any change in our position. In the meantime, however, there are certain coverage issues raised by the claimant's allegations that we would like to bring to your attention.

Personal Injury/Advertising Injury Exclusion

Please be advised that the Policy excludes coverage "to Personal Injury or Advertising Injury arising out of libel or slander or the publication or utterance of defamatory or disparaging material made by or at the direction of the insured with knowledge of the falsity thereof concerning any person or organization…" *Section VI. (I.3)*. The Policy also excludes coverage to "Advertising Injury arising out of any act committed by the Insured with actual malice." *Section VI. (J.4)*. "Personal Injury" means "any injury arising out of the publication or utterance of a libel or slander or of other defamatory or disparaging materials, or a publication or utterance in violation of an individual's rights." *Section VII – Definitions*. "Advertising Injury" means "injury arising out of an offense committed in the course of the Insured's advertising activities if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition, or infringement of copyright, title, trade dress or slogan or use of another's advertising ideas." *Section VII – Definitions*.

Fraud and Dishonest Acts Exclusion

The Complaint alleges intentional/malicious acts. The Policy excludes coverage for "any fraudulent, criminal, malicious or materially dishonest acts…." *Section VI. - Exclusions (E)*.

Punitive Damages Exclusion

The Complaint also seeks punitive damages. The Policy does not cover punitive damages. Specifically Damages is defined as "compensatory judgments, settlements or awards but does not include punitive or exemplary damages, fines or penalties." *VII. DEFINITIONS - Damages*. Furthermore, Chubb reserves its right to deny coverage under the Policy for punitive damages to the extent punitive damages are not insurable by law.

**Exhibit C**

**FACULTY OF ARTS**

Women's Studies Program
2500 University Drive NW
Calgary, AB, Canada T2N 1N4

22 July 2020

To Whom It May Concern:

I am a senior Full Professor, with twenty years experience at the University of Calgary. During my career, I have taught and published on pornography with the full support of my institution.

In 2014, a columnist in the Globe and Mail referenced me by name in an article decrying pornography studies. Without any scientific or pedagogical evidence, they called for university administrators and granting agencies "to put a halt" on the field by preventing scholars like me from pursuing my scholarship. I felt that my research, not to mention my livelihood had been threatened. Sure enough, there were calls to the university sufficiently worrisome that additional security was scheduled near my office and classrooms for the remainder of the term. I am lucky, however. I live and work in a jurisdiction where evidence-based scholarship is valued and my institution was willing to take the extra precautions to ensure my safety.

Since the publication of that 2014 article, there have been other instances where anti-sex and misogynist members of the community have coordinated to threaten me. While my institution continues to support me, the cost to my mental health and the fear that members of my family may be harmed (I have had on occasion felt sufficiently worried to request additional security precautions for my child at school) has definitely affected my ability to do public scholarship and education on pornography and healthy sexualities.

In 2017, The House of Commons Standing Committee on Public Health released its report on "The public health effects of the ease of access and viewing of online violent and degrading sexually explicit material of children, women and men." I was one of five public health and sexuality scholars to submit a brief detailing the science behind pornography and advising the committee that:

> *... the existing empirical evidence fails to indicate that sexually explicit materials (SEM) cause substantive harm to community health or well-being in Canada. Further, the historic application of existing legislation regarding the regulation of SEM have particularly burdened gender and sexually marginalized individuals, as their legally protected rights have been compromised by claims that their sexual practices mark them as unhealthy.*

The **final report agreed with our recommendations**, despite the fact that the overwhelming number of submissions and in-person witnesses were aggressively anti-porn. Among them was Gary Wilson. Nonetheless, the committee concluded that research has not established any "causal relationship" between watching pornography and negative social or sexual behaviour, and carefully distinguished the qualified, trained, and experienced researchers from those who appropriate research in non-scientific ways to satisfy their own ideological biases.

Scholars, scientists, and health professionals must be able to conduct research on sexuality and pornography in a safe and respectful environment. When we are threatened, it is not only us who are harmed but also society as a whole. Stigma, shame, and sexual abuse thrive in environments that do not support the entire spectrum of sexual identities, and that view sex as "dirty." As I wrote in my response to that 2014 article:

> *Once we remove that veneer of societal disgust – and judging by pornography's ubiquity in Canada, it is merely a veneer – we can begin to talk about sexual expression as a human right that should always be self-determining, authentic, and empowering of ourselves and others. That's how we create a truly decent society."*

I ask you to reflect on the fundamental meaning of decency and to allow it to guide you into ensuring the safety of sexuality scholars and scientists.

I am available to speak to the courts about this crucial issue of human rights, intellectual freedom, and personal safety.

Sincerely,

Rebecca Sullivan

Dr. Rebecca Sullivan

June 24, 2020

To whom it may concern:

I am a cultural scientist at the University of Paderborn, Germany, studying and teaching pornography. Receiving pushback from within and outside of academia has accompanied my work in the field from the very onset. However, about a year ago, I learned a painful lesson as to how drastic these attacks can get, if the wrong people get involved.

On August 22nd, a popular German right-wing politician retweeted a Twitter post in which I had announced that I was going to teach a course about the science of pornography at the Free University of Berlin and added a derogatory comment. What followed was a 48h shitstorm of thousands of vile responses, ranging from sexualized comments to insults to threats to blatant antisemitism. It quickly reached US twitter which gave it even more visibility. I sought help from an organization specializing in hate speech who considered the situation potentially dangerous enough to advise the university to take special measures to protect me. I literally had security guards waiting outside my class to make sure that the digital violence would not turn into physical violence, or at least to disturbances. I had to check every single ID of my students. Since that day, online harassment is basically part of my daily life, even if not with the same intensity. I filed charges against roughly 25 accounts, so far – the procedures are still going on. My employer both at the University and at the University of Paderborn have received several e-mails demanding to not have me teach this class or be fired from my job altogether. All because of a SINGLE Tweet.

Gary Wilson also commented on said tweet arguing that I was a member of "the group engaged in illegal trademark infringement of the legitimate YBOP." Already before that shit storm, he had listed me on his website as "porn science denier" because I deconstruct the cultural narrative around 'porn addiction' in my dissertation project. I assume that he became aware of me when I published a piece on porn addiction that also cited Dr. Prause's work. In another post on his website, he claims that I was "ask[ing] twitter to de-platform Nofap" citing a tweet in which I merely commented on the lack of transparency in Twitter's verification process. Though not actually following me on Twitter, he is clearly following my actions. In yet another post, he links to a video by Gabe Deem who made a 15-minute YouTube video trying to debunk a journalistic (!) piece of mine and calls me "pro-porn propagandist" and my writing "irresponsible." I have never met or been in contact with neither of this men and have never attacked them in any way whatsoever.

The fact that I – as a junior scholar in Germany who is not even in his field – is already on his list speaks volumes about the time and effort he invests into this. He even google translated an entire text of mine from German to English. I find his behavior obsessive. And he has absolutely no scruples to potentially ruin a young scholar's career. All of this, however, is nothing compared to what Dr. Prause is experiencing with Gary Wilson. If I were in her place, I would probably have ceased my research in this area by now for my own safety and sanity. The psychological stress put on her, apart from the constant need to defend her work, uncomfortable conversations with employers, funders, etc. must be beyond exhausting. She needs to be protected from the harassment of this man and there have to be legal consequences for what he is doing. His actions go far beyond anything I cold consider free

speech. Furthermore, he needs to be excluded from the research community and kept from joining events in which he is not open to listen and learn anyways. He is denying the scientific results of dozens of studies because they do not serve his agenda. He has a visible history of harassment, invasion of privacy ("doxxing"), and cyberstalking and are not making any good faith efforts to address scientific issues. Gary Wilson is not a scientist whatsoever and has no place at scientific events. I would absolutely not feel safe in a room with him – let alone, if I were in Dr. Prause's place.

I have the highest respect for Dr. Prause's scientific work and consider her an indispensable source for my own projects. I strongly believe in the freedom of teaching and research and I fully support the USA courts providing whatever protections are available for Dr. Prause.

Sincerely,
Madita Oeming

March 22, 2020

To whom it concerns,

This is in regard to the ongoing harassment I have personally experienced from Mr. Gary Wilson. Unfortunately, due to his persistent harassment and continuously publishing false and misleading information about me and my family online. My family and I have had to take protective measures by relocating and changing jobs. Over the last two years, Mr. Wilson has written hundreds of pages defamatory accusations of my character and misrepresented interactions we have had to his 10's of thousands of followers.

Our very first interaction on social media in March of 2018, Mr. Wilson doxxed my employer and address for all his followers to see, and threaten to report/file false claims to my professional organization. Since that time he has invented conclusions, made false and misleading accusations and posted pictures of my wife and how to locate us. Although our interactions have been minimal at best in the last two years he has continued to post almost weekly hundreds of pages on his websites in multiple languages he misrepresentations and accusations about me and my family. He has not only falsely accused me but has linked his highly popular site to private and personal social media accounts of my wife and family, including pictures, employer and documents that have my personal address and phone number.

Furthermore, he has filed frivolous suits against me by filing a complaint with the World Intellectual Property Organization (WIPO). With false accusations of trademark violations and attempted to squelch my freedom of speech by shutting down my website. Which neither mentioned him, his content, his image or any kind. Needless to say and fortunately Mr. Wilson lost. But that was only after thousands of dollars fighting a frivolous claim.

Unfortunately, this WIPO filing provided Mr. Wilson my personal address and phone number. In the context of his historical behavior, history of harassing and relentless obsession with silencing professionals. I received multiple threating legal letters. To say the least these experiences have been fighting for me and my family to a point we no longer feel safe living in our own home, have switched employers and had to take careful measures to remove any private information online.

Mr. Wilson's behavior appears to be obsessive and dangerous, at the very least highly irresponsible and reckless. He seems to be inclined to impulsive extremes, interviewing with white supremacists, lying and attacking me and my fellow colleagues on his site, interviews, and social media. He has repeatedly demonstrated irrational behavior without any regard to those he attacks. Where even a friend of his reached out to me to inquire about me. Mr. Wilson seems to have no boundaries or concerns for his behavior. In spite of me having little to no interaction with him, for over a year he continues to defame me routinely on his various websites and social media. To the point now that I have lost clients and potential clients due to his behavior against me.

Daniel A. Burgess

Daniel Burgess

**Exhibit D**



safe at home

California Confidential Address Program

**Nicole Renee [illegible]ause # 2823**

**P.O. Box 1318**

**Sacramento, CA 95812**

[illegible]LEASE ADDRESS MAIL AS SHOWN ABOVE)

**Expires 11/13/2023**

[illegible] that the bearer is a participant of the Safe at Home Program [illegible] by California Government Code Sections 6205-6217.

[illegible] statutory or administrative requirement [illegible] please keep the [illegible] confidential.

[illegible]

# Exhibit E



**Figure 1. "Assassinate that shit cunt" from NoFap**

**Figure 2. "I am fighting [her] to the death as a no fap soldier" from Reddit NoFap**

**Figure 3. "this attack is actually their death wish" from NoFap.com**



Psychology Today
Find a Therapist
Get Help
Magazine
Today

Jewish Subversion

Submitted by Hitler the great on April 19, 2019 - 3:27am

I really can't believe you are an academic. Can you define hate speech for me sweetheart? Oh, what you can't because it is purposely used as a broad term to stop any speech that you hate. That's what it really is isn't is sweetly; hate speech is speech you hate. This is just an attempt to slowly take away the 1st amendment. And why is it that whenever anyone even mentions the jews its antisemitic? Is it because you and Dr. Jizzrag are jews? Is it because jews are disproportionately behind the creation of porn? You are not a scientist. You do not seek truth. You are a coward that wants to silence anyone who can prove you wrong. That porn money won't last forever sweatheart start planning because the day of the rope is coming.

Reply to Hitler the great
Quote Hitler the great

**Figure 4. From Psychology Today story in which Prause was interviewed**

Psychology Today
Find a Therapist
Get Help
Magazine
Today

You Jews are fucking pathetic

Submitted by Hitler the great on April 19, 2019 - 2:56am

You Jews are fucking pathetic. The masses are waking up right in front of you and all you can do is write articles full of lies. The funny thing is your money won't help you. Tell the truth, or perish like your ancestors!

Reply to Hitler the great
Quote Hitler the great

**Figure 5. From Psychology Today story in which Prause was interviewed**



Psychology Today

Find a Therapist

Get Help

Magazine

Today

Jewish Subversion

Submitted by Hitler the great on April 19, 2019 - 3:27am

I really can't believe you are an academic. Can you define hate speech for me sweetheart? Oh, what you can't because it is purposely used as a broad term to stop any speech that you hate. That's what it really is isn't is sweetly; hate speech is speech you hate. This is just an attempt to slowly take away the 1st amendment. And why is it that whenever anyone even mentions the jews its antisemitic? Is it because you and Dr. Jizzrag are jews? Is it because jews are disproportionately behind the creation of porn? You are not a scientist. You do not seek truth. You are a coward that wants to silence anyone who can prove you wrong. That porn money won't last forever sweatheart start planning because the day of the rope is coming.

Reply to Hitler the great

Quote Hitler the great

**Figure 4. From Psychology Today story in which Prause was interviewed**

Psychology Today

Find a Therapist

Get Help

Magazine

Today

You Jews are fucking pathetic

Submitted by Hitler the great on April 19, 2019 - 2:56am

You Jews are fucking pathetic. The masses are waking up right in front of you and all you can do is write articles full of lies. The funny thing is your money won't help you. Tell the truth, or perish like your ancestors!

Reply to Hitler the great

Quote Hitler the great

**Figure 5. From Psychology Today story in which Prause was interviewed**



**Figure 6. From Psychology Today story in which Prause was interviewed**

**Figure 7. "I'd piss on her grave if I could". "We are basically fighting to the death."**



Figure 6. From Psychology Today story in which Prause was interviewed



Figure 7. "I'd piss on her grave if I could". "We are basically fighting to the death."





Figure 8. "I hope there's bloodshed" after Alexander Rhodes posted “Dr. Prause is an evil person” to over 25,000 followers.

https://trollyshitpost.com/tag/nicole-prause/

This is what NoFap has been saying for years now! But what does Nicole say, to completely refute it?

> But Dr Prause said this study failed to ask men questions about masturbation.

> 'This is known as a third variable problem,' Dr Prause said.

> 'The authors seem to be trying purposefully to blame sex films for erectile difficulties.'

Well, it seems you haven't tried that to isolate that 'third variable' yourself. But every NoFapper knows that PIED also affects masturbation without porn! It's part of the self-test we check to see if we have PIED. Get fucked Nicole!

What really fascinates me about David J. Ley and Nicole Prause fighting against NoFap, is NoFap has been corroborated by The Naval Medical Centre of San Diego, according to the article, and Cambridge University, Max Planck Institute and many other prestigious colleges and universities according to Your Brain On Porn.com, but it is only David J. Ley and Nicole Prause in every study that 'refutes' those findings! If so many colleges and universities have studies that agree with each other, i.e. they are peer reviewed science, what real standing does David J. Ley and Nicole Prause really have. But their 'findings' always seem to find a publication!

If you liked my blog, feel free to upvote it, and don't forget to share this on Twitter with – David J. Ley and Nicole Prause. And remind this on your

**Figure 9. "Get fucked Nicole!"**



**Figure 10. Stole a personal photograph of Prause in front of a Jewish deli for an anti-semitic website POAL discussing NoFap.**



**Figure 11. Rape would give Prause the "attitude adjustment" Prause needs according to this forum on SicEm discussing NoFap.**



**Figure 12. Gary Wilson follower would "punch in the face, rip of their clothes, and anal rape" Prause.**

**Figure 13. NoFap reddit offers to murder Prause.**



**Figure 14. Donor to NoFap posts antisemitism and offers to fight Prause to the death.**

**Figure 15. Funder of NoFap incites others to fight "till death" against Prause.**

**Figure 16. NoFap reddit in thread about Prause on their platform says they should "napalm" the city.**



**Figure 17. In thread naming Prause on NoFap reddit, poster says they are "armed and ready".**

**Figure 18. Thread naming Prause on NoFap reddit calls for my "heads atop a pike".**



**An update on your report**

Thanks again for letting us know. Our investigation found this account violated the Twitter Rules:

**NoFap ResistanceArmy**
@Valerian122

Violating our rules against posting <a href='{{link}}' target='_blank'>violent threats</a>.

We appreciate your help in improving everyone's experience on Twitter. You can learn more about reporting abusive behavior here.

Figure 19. Twitter removed threat of violence against Prause from a NoFap account.



Figure 20. NoFap Reddit full name "Nicole Prause" with "smash the enemies armour into a million pieces. Then we will go in for the jugular vein!"

Exhibit F

**Via Email: alicia@stanleyschmittlaw.com**
Alicia Schmitt, Esquire
Stanley & Schmitt PC
2424 Craftmont Avenue
Pittsburgh, PA 15205

**Via Email: astebbins@minclaw.com**
Andrew Stebbins, Esquire
Minc LLC
200 Park Avenue, Suite 200
Orange Village, OH 44122

RE: **Alexander Rhodes v. Nicole Prause and Liberos LLC**
**Docket No.: 2:19-cv-01366 (USDC - Western)**
**Our File No.: 1182-70931P**

Counselors:

From monitoring the Twitter account, @NoFap, which is known to be owned and controlled by your client, Alexander Rhodes, it is apparent that Mr. Rhodes intends to make a public announcement concerning this or other related litigation tomorrow.

NoFap

Instead of just leaving us alone to focus on recovery, the porn industry and certain allies have decided to launch a campaign of defamation and smears against us and our founder. We've generally tried to ignore their attacks, but they have been escalating.

Announcement tomorrow.





**From:** Andrew Stebbins [mailto:astebbins@minclaw.com]
**Sent:** Monday, November 11, 2019 11:04 AM
**To:** Philip J. Sbrolla; 'Alicia Schmitt'
**Subject:** RE: Rhodes v. Prause, et al.

Phil,

The "announcement" is simply a crowdfunding campaign to help Alex offset the cost of this litigation that he is incurring. Your clients are not referenced by name and there are no details about the case being posted outside of the public record. We are confident in the claims of our case and in our ability to prevail at both the motion phase and at trial.

If you would prefer to discuss further over a call let me know. Thanks.

Andrew

# Exhibit G



nofap.com/defend-alex/
NoFap
Get a new grip on life.
ABOUT
PORN ADDICTION BASICS
COMMUNITY FORUMS
Defend NoFap & Alex.
End the harassment.
Donate Now
In retaliation for effectively whistleblowing the negative effects of excessive Internet porn use, the porn industry and its allies are on a mission to defame, deplatform, and destroy NoFap and its founder Alexander Rhodes.

**Exhibit H**

---------- Forwarded message ---------
From: Aaron Minc <Aminc@minclaw.com>
Date: Jul 30, 2020 10:59 AM
Subject: Twitter Defamation - Nicole Prause
To: William Pentecost <WPentecost@c-wlaw.com>
Cc:

Mr. Pentecost,

I don't think I've had the opportunity to meet you yet. As I'm sure you are aware, Mr. Stebbins and I represent Alex Rhodes.

Exhibit I

Minc | Defamation Removal Law
Online Reputation & Brand Protection Lawyers

Andrew Stebbins
astebbins@minclaw.com

August 12, 2020

*Via Email*
William B. Pentecost, Jr.
Cipriani & Werner
650 Washington Road, Suite 700
Pittsburgh, Pennsylvania 15228
wpentecost@c-wlaw.com

RE: ***Alexander Rhodes v. Nicole Prause and Liberos LLC***
***Case No. 2:19-cv-01366***
**Discovery Deficiencies and Other Pending Concerns**

Dear Bill:

I write with regard to your clients' responses to our First Set of Discovery Requests received by our office on August 8, 2020. After reviewing the responses of both Dr. Prause and Liberos LLC, there are numerous deficiencies in their responses that need to be resolved by August 19, 2020. I am hopeful that these discovery deficiencies can be resolved without further Court involvement, however these responses are crucial to our discovery and we will not hesitate to file a Motion to Compel to these responses and production.

**Deposition Scheduling**

Thank you for clarifying that Dr. Prause is not available to schedule a deposition until on or after Friday, August 21. Unfortunately, this comes after at least four prior attempts to schedule a deposition with your client since this discovery period was authorized by the Court. To avoid any further delay and to have enough time prior to the August 26 supplemental brief deadline, we are noticing your client Dr. Prause to make herself available for deposition on the first day that you indicated that she would be available: August 21. Due to COVID-19, we are happy to conduct this deposition virtually and Dr. Prause can appear at a court reporter's office in the Los Angeles area while maintaining proper precautions and social distancing parameters. Further information will be provided in the Notice of Deposition.

While we are wondering why you feel that it is necessary to depose our client Mr. Rhodes in this limited jurisdictional discovery pertaining to your clients' contacts with the state of Pennsylvania, Mr. Rhodes is happy to cooperate. Pursuant to our previous conversation, Mr. Rhodes will make himself available for deposition on Friday, August 21 prior to Dr. Prause's deposition. Alternatively, he is available on Monday, August 24 after 12 pm ET or Tuesday, August 25 after 12 pm ET or Tuesday, August 18 after 12 pm ET. Due to COVID-19, Mr. Rhodes would prefer to appear virtually.

We have also noticed Defendants' witness Greg Siegle for deposition for August 17, 2020. The deposition will be conducted remotely, with Dr. Siegle to appear at Constance Lee & Co. in

Pittsburgh. A copy of the subpoena was served via the Court's ECF system. Regarding other potential witnesses who we're considering to testify at the jurisdiction hearing, we began the decision process after your clients' initial written discovery was provided. We will make the requested information available to you as soon as possible.

**Plaintiff's Pending Discovery Requests**

To begin, your assertion in your Brief in Opposition that we were somehow waiving any argument regarding your objections is unfounded. It was not possible to evaluate your clients' responses until this past Saturday, as zero documents were produced until then. Without being able to review the totality of your responses, any response to your objections would be incomplete. Further, in contravention of the clear Court order, every one of your produced documents was marked "For Attorney's Eyes Only" despite many of those documents not containing personal information listed by the Court's protective order. Also, important information such as email addresses and names were redacted without justification. The Court's Order of July 29th was very clear on what information would be allowed to be marked as "Attorney's Eyes Only," and your client chose to expand the Order without proper authorization from the Court to do so. We would ask that you provide the unredacted documents (while maintaining redactions for social security numbers, physical addresses, bank account numbers, and non-Pennsylvania phone numbers) immediately for examination by Mr. Rhodes' lawyers.

Additionally, it would appear that you have maintained many of your initial and preliminary objections despite the Court Order. Specifically, the Court stated that all objections, including breadth, were deemed waived and not to be considered by the Court without further support. While you have provided supplemental responses, the preliminary and general objections that you made to each request remain. Further, the supplemental responses do not acknowledge that these objections were withdrawn, which is problematic and does not provide a clear picture as to whether all responses are complete and responsive.

Many of your objections also continue to assert that we are not entitled to conduct discovery on matters that occurred prior to October 22, 2018. This argument is not legally supported. Our discovery is to prove your clients' **continuous and systematic** contacts with Pennsylvania and are not subject to any statute of limitations argument. We are entitled to such discovery and the Court put no such limitations on our requests. Your arbitrary one-year limitation in responding to our requests is not supported, and we would ask that any documents, including emails or other correspondence, which are responsive and were from prior to October 22, 2018 be produced immediately.

You also asserted that your client does not need to produce responses related to Liberos' operations that occurred outside of the state of Pennsylvania, including, for example, any team members who work on-site at Liberos who were paid through the University of Pittsburgh. This response was given for several of the requests to Liberos, including Interrogatories 5-9. The requests submitted to Liberos were clearly tailored to examine Liberos' contacts with Pennsylvania, and the objections and arbitrary limitations in the responses are not warranted. These responses should be supplemented with the requested information.

In regard to specific requests, Dr. Prause's response to the Request for Production No. 6, requesting a copy of her tax returns for the years of 2016 – 2019, is woefully deficient. Dr. Prause provided limited documents from her tax filings for 2017 and even fewer documents for her tax filings for 2019. We request the immediate production of Dr. Prause's full tax filings from 2016 to 2019, as specifically requested.

Your clients purport that the study titled "Treating restricted affective range in a mediation retreat model" was cancelled, yet your clients did not provide responsive documents related to this study or its alleged cancellation. Despite the project being cancelled, important documentation, including a budget, emails, and other responsive documents, would still have needed to be created to gain approval and funding for the project. These documents are relevant despite the fact that the study was apparently cancelled. We request that you supplement your response with all available responsive documentation related to this study.

Similarly, the response of Liberos to Request No. 5 is woefully deficient. Again, Liberos incorporates several inapplicable objections, including the arbitrary limitation previously discussed and that no tax returns were filed in Pennsylvania. We are clearly entitled to discovery regarding Liberos' financial statements, and you have failed to provide any such documents other than for the year of 2017. We request that these responses be updated immediately.

More inapplicable objections were made by Dr. Prause to Interrogatories Nos. 4 and 7. Your response is wholly unresponsive to the Interrogatories. Your objection repeats the arbitrary, and unfounded, limitation to the years of 2018 and 2019, and fails to provide any information regarding Dr. Prause's income or the sources of funding for Dr. Prause's research. Even if the information were "publicly available" (which we do not believe to be wholly accurate here), that does not absolve Dr. Prause's responsibility to respond to the Interrogatory. These Interrogatories are clearly relevant to our jurisdictional analysis and seek information to which the Defendants have greater access to than Plaintiff and require immediate supplementation by Dr. Prause.

**Proposed Protective Order**

Your letter indicated that your client is requesting another protective order. We feel that this is now unnecessary, as your clients already submitted a Motion for a Protective Order to the Court, which was ruled on by Judge Kelly, and your client has now responded to the document production requests. For the purposes of moving this case forward without further delay, my client agrees to interpret Judge Kelly's protective order as being applicable to all aspects of limited jurisdiction discovery, including any depositions that will take place. We hope that this adequately addresses your clients' concerns.

**Claims Made in Court Filings**

I would like to also address the allegations made against my client in your previous attorney correspondences, your Brief in Opposition to Plaintiff's Motion to Compel, and in your Motion for a Protective Order. In your Brief in Opposition, you allege, without any evidence, that my client was posting sensitive information regarding the case, directing others to post "documents

filed or exchanged in this case on the Internet," and suggested that providing routine discovery to Plaintiff would somehow jeopardize your client's safety.

You clearly stated in your Motion that my client is directing others to post information about this case online on "his behalf." The only "evidence" you provide for these allegations is letters which your firm has sent to me which contain false claims about Mr. Rhodes. There is not one attachment to your motion which shows that my client has disseminated any personal information about your client or even any publicly accessible documents from the docket, except for the complaint .pdf file being hosted on NoFap's website. Further, you have zero evidence to show that my client is directing others to do so on his behalf – as this never has occurred. Your Brief in Opposition primarily relied on screenshots of Mr. Gary Wilson commenting about the case on the Internet. We are aware that your client has a long-standing dispute with Mr. Wilson, one of the seven non-party witnesses who submitted declarations in this case. For the avoidance of any doubt, Mr. Wilson does not represent Mr. Rhodes, nor has Mr. Rhodes ever directed Mr. Wilson to comment about this litigation or to share documents from the docket on his behalf. As your client is aware, Mr. Wilson's documentation of your clients' alleged tortious conduct long predates this lawsuit. The only people who can speak and act on Mr. Rhodes' behalf are myself and other lawyers retained by him.

Finally, these misleading allegations ignore the fact that your client continues to widely disseminate information about the case across the Internet, including publicly sharing private attorney correspondences and making allegations against my firm of improper conduct. While the defamatory attack on our firm has been addressed, it is certainly disingenuous to argue to the Court that my client is allegedly posting about this case online while at the same time your client is engaged in such improper conduct.

I, as well as my client and his other attorneys, have at all times throughout this litigation conducted ourselves professionally and have never once directed others to attack, threaten, or engage in tortious conduct against your client. I would request that your client cease her tortious attacks on my client, myself, and my firm.

I appreciate your desire to work towards concluding our jurisdictional discovery. If you would like to discuss the contents of this correspondence, please let me know, and we can schedule a phone call. Thank you.

Very truly yours,

Andrew Stebbins

ACS:dmb
cc: Alicia Schmitt, Esq. via email

Exhibit J

**Truth and Justice Seeker** @speak_justice · 7h

Website now updated to expose slander & speak justice for victims. @BrainOnPorn Twitter shut down for hateful conduct. realyourbrainonporn website no longer exists due to infringing @YourBrainOnPorn Trademarks, & a lawsuit has been raised for retweeting @NicoleRPrause defamation.

**Truth and Justice Seeker** @speak_justice · 7h

Replying to @Sarah_Mojarad @jonathanstea and 2 others

Falsely accusing people of death threats and harassment is Prause's Porn Playbook. She deliberately & maliciously target researchers, psychologists, clinical therapists, journalists, educators, activists and organisations for speaking up about porn harms.

EXPOSED

Home

Uncover the facts

realyourbrainonporn.exposed

**Exposing Anti-Your Brain On Porn** @AntiYBOPexposed · Oct 18

Oh my, Nicole Prause (@BrainOnPorn) is about to be sued by yet another party for defamation & harassment.

Is this the 6th lawsuit for Prause?

Prause's ally is being sued for retweeting Prause lies about Aaron Minc.

When will Prause's followers learn?

> **Gary Wilson** @YourBrainOnPorn · Oct 16
>
> 1/ NEWS: Nicole Prause (who runs @BrainOnPorn) is about to be sued for defamation by yet another person.
>
> Prause's upcoming suit is revealed in this new defamation suit against a Prause twitter follower who retweeted Prause's defamation (PDF): yourbrainonporn.com/wp-content/upl...
>
> First 4 pages
>
> Show this thread
>
> [illegible]

Show this thread

 Gary Wilson @YourBrainOnPorn · Oct 16

Below we have the 5th page of Aaron Minc's complaint.

Prause and her buddies picked on the wrong person. More about Aaron Minc - minclaw.com/bio/aaron-minc/

of which will be proven at trial.

26. Plaintiff additionally requests a permanent injunction against Defendant declaring that these allegations are false, defamatory, and that Defendant is prohibited from creating or publishing the same or similar defamatory statements about Plaintiff or his business in the future.

WHEREFORE Plaintiff prays for judgment against Defendant in conformity with the allegations set forth above and asks this Court to award compensatory, special, actual, and punitive damages amounting to at least $25,000 with the exact amount to be proven at trial, attorneys fee's and court costs, a permanent injunction against Defendant declaring that these allegations are false, defamatory, and that Defendant is prohibited from creating or publishing the same or similar defamatory statements about Plaintiff or his business in the future, and for any and all other relief

   3

Gary Wilson
@YourBrainOnPorn

Replying to @YourBrainOnPorn

Just found this excellent article: "Documenting Patterns of Intimidation, Bullying and Defamation: Towards Public Accountability for the Actions of Dr. Nicole Prause".
drive.google.com/file/d/1m357MH...
Appears to be circa 2017.
So much has since occurred (such as 5 lawsuits naming Prause).

Prause paper final.pdf
drive.google.com

10:01 AM · Sep 21, 2020 · Twitter Web App

4 Likes

# Exhibit K



https://web.archive.org/web/20201101075103/https://www.yourbrainonporn.com/wp-content/uploads/2020/10/1_Aaron-Minc-vs-Melissa-Farmer.pdf

Exhibit L

| Attorney or Party Name, Address, Telephone & FAX Nos.,State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| **Michael Jay Berger**<br>**9454 Wilshire Boulevard, 6th floor**<br>**Beverly Hills, CA 90212**<br>**(310) 271-6223 Fax: (310) 271-9805**<br>**100291 CA**<br>**michael.berger@bankruptcypower.com** | |
| ☐ *Individual appearing without attorney*<br>☑ *Attorney for Debtor* | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| In re: **Nicole R. Prause**<br><br>Debtor(s) | CASE NO.: **2:20-bk-17525-NB**<br>CHAPTER: **7**<br><br>**SUMMARY OF AMENDED SCHEDULES, MASTER MAILING LIST, AND/OR STATEMENTS [LBR 1007-1(c)]** |
|---|---|

A filing fee is required to amend Schedules D, or E/F (see Abbreviated Fee Schedule on the Court's website www.cacb.uscourts.gov). A supplemental master mailing list (do not repeat any creditors on the original) is also required as an attachment if creditors are being added to the Schedule D or E/F. Are one or more creditors being added? ☑ Yes ☐ No

The following schedules, master mailing list or statements (check all that apply) are being amended:

☐ Schedule A/B ☐ Schedule C ☐ Schedule D ☑ Schedule E/F ☐ Schedule G

☐ Schedule H ☐ Schedule I ☐ Schedule J ☐ Schedule J-2 ☐ Statement of Financial Affairs

☐ Statement About Your Social Security Number(s) ☐ Statement of Intentions ☑ Master Mailing List

☑ Other (*specify*) Verification of Creditor Mailing List

I/we declare under penalty of perjury under the laws of the United States that the amended schedules, master mailing list, and or statements are true and correct.

Date: 12/2/20

Nicole R. Prause
Debtor 1 Signature

Exhibit M



# FOX 11 Investigates: Reputation defense companies utilizing fraudulent lawsuits and illegal hacks to silence online consumer complaints

**LOS ANGELES** - A months-long FOX 11 investigation reveals some businesses are using elaborate schemes to silence online critics through the use of fraudulent defamation lawsuits, filed against people who may not even exist, and even the use of international hackers, all designed to silence consumers and their criticism.

https://www.foxla.com/news/fox-11-investigates-reputation-defense-companies-utilizing-fraudulent-lawsuits-and-illegal-hacks-to-silence-online-consumer-complaints

reason.com/volokh/2020/01/20/fraudulent-lawsuits-and-illegal-hacks-to-silence-online-consumer-complaints/

LATEST MAGAZINE VIDEO PODCASTS VOLOKH NEWSLETTERS DO

FREE SPEECH

# "Fraudulent Lawsuits and Illegal Hacks to Silence Online Consumer Complaints"

A new story from Fox 11 (L.A.).

EUGENE VOLOKH | 1.20.2020 12:30 PM

Some of it may be familiar to our readers (see here for my brief on the "fraudulent lawsuits" side of the analysis), but there's a new item, too:

> [Aaron] Minc advertises himself as an internet defamation attorney, capable of "removing damaging content from the internet."
>
> He can be seen in an advertisement with a man named Pierre Zarokian, who runs a reputation management company called Submit Express. "We've helped many companies get rid of Ripoff Report, and we've been successful in doing this," Zarokian says in an online video. In 2018, the FBI [charged Zarokian] with felony conspiracy after he was caught paying an international hacker in [Cyprus] to remove

https://reason.com/volokh/2020/01/20/fraudulent-lawsuits-and-illegal-hacks-to-silence-online-consumer-complaints/

# Exhibit N

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona
JAMES R. KNAPP
Assistant U.S. Attorney
Arizona State Bar No. 021166
ANDREW C. STONE
Assistant United States Attorney
Arizona State Bar No. 026543
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: james.knapp2@usdoj.gov
andrew.stone@usdoj.gov
Attorneys for Plaintiff

___ FILED X LODGED
___ RECEIVED ___ COPY
DEC 1 2 2018
CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY M. [illegible] DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

United States of America,

Plaintiff,

vs.

Pierre Zarokian,

Defendant.

No. CR18 1626-PHX-JJT

**PLEA AGREEMENT**

Plaintiff, United States of America, and the defendant, PIERRE ZAROKIAN, hereby agree to dispose of this matter on the following terms and conditions:

1. **PLEA**

The defendant will plead guilty to the Information charging the defendant with a violation of 18 United States Code (U.S.C.) § 371, Conspiracy, a Class D felony offense.

2. **MAXIMUM PENALTIES**

a. A violation of 18 U.S.C. § 371 is punishable by a maximum fine of $250,000,

# Exhibit O

 PlainSite
@PlainSite

Attorney Aaron Minc, who practices "law" at Minc LLC in Northeast Ohio a few offices down from Trader Joe's and the Apple store, is a key figure in a network of massive extortion rackets. Minc has design sense—his firm has its own trendy logo—and a nice suit. Ethics, not so much.

9:09 AM · Jul 15, 2019 · TweetDeck

1 Retweet 1 Like


**PlainSite**
@PlainSite

Aaron Minc has in the past contacted PlainSite to have cases removed that his clients didn't want in the public domain. But he mistook PlainSite for another scam. He offered cash without prompting. Obviously, we turned it down. We don't take money to remove cases, and never have.

PlainSite Request 1SM30AP (4159)

First Name: Aaron
Last Name: Minc
Organization: Dinn Hochman & Potter, LLC

Phone: [redacted]
E-Mail: AMinc@[redacted]

URL: http://www.plainsite.org/dockets/[redacted]

What kind of action would you like us to take?
Question

Please provide the details of your request.
Dear Plainsite.org Admin,

I have a law practice that focuses on Internet Defamation and removing content from the Internet. I have clients from time to time that approach me who have content posted about them on your website.

I think we both know and understand that legally, your website has every right to post the content that it does. However, I'm curious whether you would ever consider or might have policy whereby you would agree to either remove content from your site, or simply apply exclusion code to a particular URL to remove it from search engine results (but not from the site itself).

Every situations is different. But many times I'm am able to negotiate a significant fee on behalf of my client if your site is interested or able to take any sort of action. Please let me know if this is something you would be interesting in discussing further or would ever consider.

Regards,

Aaron Minc
AMinc@[redacted]

How would you rate PlainSite?
Excellent

Channeling client money to extortion rackets isn't practicing law. Nor is it "arbitration." It's thuggery. Minc and his co-counsel at Minc LLC who are engaged in the same kinds of practices should be immediately disbarred and criminally prosecuted. @FBICleveland

9:22 AM · Jul 15, 2019 · TweetDeck

2 Likes

Antifascista Ben
@cyberbenb

Cult Reporter Be Scofield Defeats Frivolous SLAPP Lawsuit filed by Minc Law and Aaravindha Himadra FOR IMMEDIATE RELEASE THE GURU MAGAZINE Media Contact: gurunewsmedia@gmail.com 10/21/... gurumag.com/be-scofield-s... via @bescofield #metoo #abuses

3:03 PM · Jan 30, 2020 · Twibble.io

reputationmanagement.co/docketbird-com-removal-from-google-federal-court-document-deletion-service/

reputation
management

SERVICES PARTNER FAQ NEWS

FREE ASSE

# How To Delete Docketbird.com Search Results

Docketbird is a website owned by the internet defamation attorney Aaron Minc out of Ohio. They provide you a few easy ways to remove and delete your court record results. Here are your options for fixing these search results using an online reputation management service or a company like us.

Option 1: Search Engine Suppression. This is where you create new content and push up already existing content to lower the overall visibility of the search result from Docket Bird that you want to hide. This can be a bit expensive and you will want to have public relations material to promote about yourself or company that

**Declaration of Althea Azeff, JD**
**Mother of Alexander Rhodes of NoFap**
**Client of Aaron Minc**

Confidential statement in response to reading the amended pleadings from plaintiff in Alexander Rhodes v. Dr. Nicole Prause/Liberos (Case No. 2:19-CV-01366), as filed Jan. 24, 2020

**Initial communication:** I reached out to Dr. Nicole Prause by phone on Friday, August 7, 2020 and, following, her attorney, Mr. William B. Pentecost, Jr., regarding litigation against Dr. Prause by my son, Alexander J. Rhodes, founder of NoFap. I recognize how unprecedented it must have seemed to reach out to the party my son sued. I could not locate the name of the firm nor specific counsel representing the scientist-defendant in this matter and, after a great deal of Internet research, located a phone number for Dr. Prause. Following a brief conversation, I contacted her counsel.

**Lead in:** Following a long period (for years now) of extreme discomfort about the fake origin story of NoFap, in general, and this litigation, in particular, I felt compelled to come forward. My son has been manipulating the media for approximately half of his lifespan thus far, having honed his skills with SEO, SEM, and self-promotion over many years with numerous endeavors (please see content that follows).

I unequivocally discouraged Alexander numerous times from filing suit against Dr. Prause. My son became irate with me each time I did not support his obsessive desire to initiate litigation.

My reasons for not believing it was appropriate for Alexander to sue include, among other things:

- The backstory of NoFap is completely fabricated;
- Alexander demonstrated to me a long pattern of hatred against women (a direct factor in this case);
- Alexander demonstrated to me a long pattern of anti-Semitism (a direct factor in this case);
- Alexander demonstrated to me an established pattern of lying to and manipulating females for money (arguably, a contributing factor in this case);
- Alexander has a history of being what I call 'litigation happy' (upon request, I can explain how I feel this, too, is a relevant factor in this case); and
- Alexander is emotionally and mentally disturbed and extremely unstable and, as such, I saw this act (of filing suit) as part of a long-term pattern of doing whatever he can to make easy money and to gain further notoriety.

Not unrelated, the timing of the filing of this particular suit coincides with when Alexander was obsessively seeking a $60,000 cash infusion to purchase a property adjacent to the home he holds with his girlfriend.

**Current state of communication with my son:** Alexander stopped speaking to me towards the end of November 2019, upon realizing that his live-in girlfriend had contacted me directly for help when, after screaming at her and blaming her for having a spontaneous miscarriage, he had left her bleeding it out alone in their Glenshaw, Pennsylvania home. She reached me by phone crying, not knowing what to do.

Because there is a large chasm between the image Alexander portrays in the media and who he really is, and perhaps buffered by various mental health diagnoses and long-held patterns of extremely disturbing behavior, I've become aware that Alexander has a particular weakness around anyone knowing the truth about who he actually is. Pertaining to his utterly inappropriate words and behavior around the miscarriage, he knew that I would want to discuss the incident with him.

*But Alexander cares neither for truth nor accountability.*

As such, I've not heard from him.[1] Additionally, I believe the filing of the lawsuit against Dr. Prause played heavily into his shift from viewing me as a confidant to someone he could no longer turn to for, among other things, narcissistic toxic dumps, furious rantings, obsessive thoughts, and fantasy-based thinking. I did not support the suit and did not want to hear his endless, rage-filled diatribes against Dr. Prause.[2]

**Why I felt compelled to come forward, at long last:** Alexander's long-time live-in girlfriend, with whom he holds an evidently non-traditional mortgage for 1157 Calmwood Road, Glenshaw, PA 15116, reached out to me by text and then by phone on July 18, 2020. She had evidently moved out of their home that day. In our discussions, I learned that Alexander had not once paid a dime towards their monthly mortgage payments in the entire 2 ½ years they had held a mortgage together. Alexander had been pressuring her to have a baby, too, and she described that she felt overwhelmed and just needed to escape. She was not sure, at that time, whether she would be able to leave for just a few days or permanently.

I had asked Alexander over and over if he was paying at least half of their mortgage, based on my personal knowledge of his ability to take advantage, financially and otherwise, of another young woman (I provide her name later in this document and offer the background of her father pulling her out of school, and out of Pittsburgh, to get her away from Alexander, following his manipulating at least $6K or $7K and possibly up to around $10K from her) and a long-term pattern of not supporting himself.

Adding to this news, Alexander also had his girlfriend borrow five digits from her 401(K) to finance, among other things, additional property (see above, and I believe he was determined to get that money from any female he could) he hoped to purchase, as well as a five-digit personal loan to do so. Unrelated to the purchase of additional property, he had also very recently asked her for a sudden, unexplained $7,000 to help him cover undisclosed "miscellaneous" expenses. On her salary alone (of approximately $55,000), she had been shouldering their lifestyle, most recently, she explained, needing to draw additional moneys monthly from her retirement account just to make the couple's mortgage payment, which had crept higher a couple of months earlier (from around $2,100 to $2,400 per month, assumedly based on increased property taxes or the like). The purchase of the additional property had not been made, ultimately, and a good deal of the borrowed money was returned to pay back the personal loan, as well as her 401(K). She believes that by living with her parents and no longer paying the mortgage, her 401(K) will be restored by the end of 2020.

---

[1] Evidently, Alexander more recently concocted a story that he shared with his girlfriend and, separately, his father that he stopped talking to me because I shared with him for the first time (when he was nearing the age of 30, and upon him telling me how much he wanted a baby and was pressuring his girlfriend) that I had not consented the night he was made and that he should allow her to come to her own mind on the matter. He continued to call me, however, as usual up to the day his girlfriend called me about the miscarriage. In fact, I was the first person the two told about the pregnancy. Alexander was calling me regularly about the pregnancy (and desire for homeschooling his eventual four children with Christian values, as he fantasized, about his girlfriend's diet, and other points) in an ongoing manner. The sudden silence occurred once he knew I knew that he had blamed her for the miscarriage, screamed at her, and left her to bleed. Then, after he returned to their home that night and when her parents arrived (at my behest), he would not let his girlfriend leave with them to care for her health and well-being. In her words, "I know how this must sound, Althea, but it's all about him. I am having a miscarriage, but it's always all about Alex."

[2] In fact, in a strange turn from usual events, Alexander did not and has not cashed a birthday check I sent to him. I offered to fly to Pittsburgh to spend his 30th together, but he kept declining that offer each of the many times I extended it. He knew how adamantly opposed I was to him filing suit against Dr. Prause. I now believe that he started to distance himself, at least around money and the topic of Dr. Prause, in late summer, September, and into October, when he must have known for certain he was going to sue her. That said, he kept calling until the miscarriage (just avoiding the topic of Dr. Prause).

To be clear, I believe that Alexander's filing of suit against Dr. Prause was timed to his constant need for easy money gained from other people's hard labor, his desire to purchase specific property, his constant need for attention by and in the media, his persistent misogyny, his love of joining and/or causing to initiate legal action (there is specific information I can provide on this point, from Activision Blizzard to at least two of his girlfriend's former landlords to another inquiry he had his girlfriend initiate) and, later, when I learned that a mental health professional was spearheading a six-digit fundraising account to pay for Alexander's litigation, such detail further fueled my beliefs above.

The straw that broke the camel's back, so to speak, was learning that his girlfriend moved out of the home and had been taken advantage of financially for the entire period they lived in that home together.[3] It struck me that my shame-filled silence could be contributing to another's pain and to Alexander's unchecked manipulation of and profit from women.

While Alexander's father has admitted to me during the few conversations we have had that Alexander is a pathological liar, mentally disturbed, bad for his girlfriend, a tyrant, manipulative, and a "dick," as he refers to him (to the extent, too, that he joked with me about how we should brainstorm ways to have him medically castrated so his poor girlfriend would not have to raise children while taking full care of him, too, and this was before the pregnancy, when I called his father in tears about the new set of lies in the CNN program), he has never and will never draw a line for Alexander around his behavior or character. In short, his father is an enabler and, even after discovering that Alexander had not paid the mortgage once, and even after admitting his son "completely lacks empathy" around the miscarriage, he will not counsel him on proper behavior and how not to be a conman. He laughs uncomfortably about all of the NoFap lies, wondering aloud how Alexander seemingly mastered the art of getting the media to believe anything he has to say. He has rewarded him, in fact, for prior bad acts (not related to NoFap), details about which I can provide upon request and if determined to be legally relevant.

It is my contention that so long as Alexander receives his father's tacit approval and enablement, the media's attention, and now the six-digit funding of this frivolous lawsuit, Alexander will go deeper and deeper into his disturbing fantasy life, hurting as many women as it takes to fund his lifestyle, one woman at a time. I contend that Dr. Prause is one of those women.

---

Following is only my personal *commentary on specific stipulations* as signed and attested to by plaintiff Alexander Rhodes, in his pleadings:

9. Strongly refute/deny. There is easily discoverable evidence of Mr. Rhodes being engaged in many other time-sucking and "out-of-control" activities and habits that "took over his life" (profit making, in fact, albeit while tax evading much of that time) from approximately that age through incorporation of NoFap.

*His back story re: NoFap is comprised of lies.*

13. Strongly refute/deny. Rhodes simply does not have the history with pornography from childhood as purported. In reality, he went from highly time-consuming obsession to highly time-consuming obsession,

[3] This girlfriend has been controlled (I can provide details upon request) by my son for years (they dated for two different periods of time, the second far longer than the former, and have cohabitated, including before the house purchase, for a long time). She shared with me on August 16, 2020 that "My 65-year old parents let me do more and go out more than Alex did."

including but not limited to: (1) setting up a store and then selling fake Louis Vuitton bags on eBay, (2) running an illegal botting endeavor against Activision Blizzard's World of Warcraft (when he was known as "ocktra," which was very well documented and remains discoverable) – in each of these two endeavors, he was a willful tax evader – (3) importing an at that time illegal in the US substance that he injected in his stomach through needles to encourage tanning his skin, rather than burning, and (4) creating SEO and SEM around how "famous" he was as the "suspicious onlooker" to the extent that, while he was an "extra" in the background of the Pittsburgh filming of *Jack Reacher*, he brought himself to the top of all major search engine results, ahead of the film's star, Tom Cruise, as the film's headliner. During this same time period, he created an imdb site for himself and listed himself, at that time, as an actor elsewhere online. After serving as one of hundreds of extras on various Hollywood films being filmed in Pittsburgh, Alexander actually left college one Fall, throwing away the tuition paid that semester, because he was "the best looking person anyone had ever seen and . . . would be the biggest star . . . making over $1M by the end" of that calendar year. He had shared plans to hire a private acting coach. Ultimately, despite the media hype he created around himself, Alexander was not shown in *Jack Reacher* as an extra or as anything else. He was able to garner other attention around that endeavor, however, which even resulted in a short spoof film and oodles of Internet attention.

This delusional period, among many others that were also perhaps[4] fueled by mania (bipolar I), was not short lasting. Alexander cut his teeth, so to speak, on creating fantasy and attention around himself for years, preparing him to master Internet search and news media manipulation for what would fuel NoFap. There were other obsessions that took up his time, as well, from achieving in school, work, or life. He also has suffered from long-term sleep issues (he chooses to stay up until the middle of the morning and sleep through most of the day, during which he obsesses over his thing-du-jour, so to speak, ranging from anything

[4] Although having a long-reaching mental health background, Alexander received no therapy or treatment for many, many years. Despite the antics he engaged in through college, however, Alexander only sought out, upon graduation, diagnoses that would translate into him never have to work, as he described it to me. It was yet another scheme. At 23 years of age at that point, he and I were sitting on a park bench where he described in great detail how, unlike me, he would not be "trash" who would have to work for a living and that he could easily obtain the kinds of mental health diagnoses that would mean he could, in his mind, "collect disability" for the rest of his life. Because, as he described, he was so talented, intelligent, and good looking, he would not endure what I had in terms of working (he described the differences between us, being the opposite of what he saw in himself). He felt his respective biological families' medical backgrounds (addictions, on one side; mental health, the other) would prove beyond doubt he would never have to work, too. I told him, among other things, that under no uncertain terms was that an acceptable plan. Later that summer and after obtaining his diagnoses, and because he believed himself to be very "special" and "unique," as he told me, he demanded $4K from me to obtain further tests (that is, those that would not be covered by insurance). I declined. I believe he wore his father down, who paid for them (and had and still has a long history of enabling Alexander) and he, Alexander, shared the diagnoses listed above with me. He confirmed the more expensive, out-of-insurance tests revealed: bipolar 1, borderline personality spectrum and disassociation, schizoid, having no work ethic, anxiety when a task is new or hard, and some other details. I maintain contemporaneous notes of that conversation, as well as the earlier psychiatric diagnoses. Alexander was put on a mood stabilizer, Lamictol, to which he claimed to be allergic and removed himself from it within a month. He was supposed to have needed to attend an intensive outpatient clinic at Western Psych on a daily basis, as well, which he never did. He never even went to therapy. Alexander said he'd spend his life in bed surfing online, having his father continue to pay his way through life until he could get the disability money, to which he thought he was entitled. Miraculously, when he got a temp job (on site at Google in Pittsburgh as a contractor through a third party company), he said that he was completely well. Now his being very special and unique turned to complaining how boring the work at the onsite employer was and how much smarter he was than Google's own employee software engineers although, he admitted, they were smart, overall. He continued to work on NoFap, refining and embellishing the back story, until he felt he could engage in that activity full-time.

such as imagined/psychosomatic health issues to the Tim Ferriss 4-hour workweek concept to soylent to creating a cult to whatever else captures his fancy – in the ocktra years, he regularly stayed up all night for many nights at a stretch; in the Hollywood star fantasy years, same, and so on and so on).

Rather than suffering any negative effects, Alexander's building of NoFap on lies and untruths has brought him great rewards, as a self-described and purportedly professionally diagnosed manic bipolar I with cluster B personality disorder traits and a fondness for, in no particular order: media manipulation, money, fame, and control, and he has been living high on the attention and money (which went unreported and then underreported in the first years, which he often flaunted and bragged to me about) he craved for many, many years. His narcissistic tendencies, too, are fueled by the media attention he created around himself.

Like his biological grandfather before him, who purported to be a Ph.D. psychotherapist but who had never finished one semester of community college, Alexander is an all-out confidence man (known more colloquially as a conman).[5]

But with very little research, one can easily trace the trajectory from scheme to scheme with deepening SEO and SEM skills from year to year – from the eBay store to the World of Warcraft botting days, and to the suspicious onlooker to NoFap. Alexander's fabricated NoFap backstory can be easily refuted by tracing his all-encompassing, time-consuming online schemes over the years.

15. Strongly deny validity and efficacy of "reporting," including, among other things, adequacy of research conducted by named news coverage outlets. As just one example related to this stipulation, upon publication of *The New York Times* article by stringer Sridhar Pappu, which was published above the fold on 1-A, I personally contacted the reporter who informed me that Alexander had threatened him aggressively against contacting me or his father, that is, those who could support or deny his claims about his childhood, by, as the reporter described: threatening to sue the reporter, forcing him to sign an NDA, and otherwise behaving in a belligerent and controlling manner with that reporter.

The reporter also shared that rather than conducting basic fact checking, as well, he merely relied on past coverage Alexander had garnered for himself. When I questioned Alexander about why the media did not contact me, he claimed that he wanted to protect family members, a lie he has used since the earliest media mentions.

This particular reporter was interested in one thing, namely, when I mentioned that I had narrowly escaped being killed by Alexander in my garage a few months earlier (see later in this document). He wanted to learn more about that potential story, but I declined (again, please see later in this document).

I contend that if Alexander bullied a reporter working on behalf of *The New York Times*, the same is no doubt true for other, if not all, news outlets.

16. Overall same commentary as above. In the case of the Lisa Ling coverage, and as the years go by (that is, over time), Alexander's lies are recast and grow deeper and more twisted still. I contacted CNN twice, however, this outlet never replied to my emails.

---

5 For years, Alexander has hero worshipped Frank Abignale/*Catch Me If You Can*. He seemed impressed, too, that his con artist biological grandfather got "Ph.D." on to his own death certificate, having fully duped his last spouse who, fascinatingly, is a mental health practitioner.

17, 18, 19, and 20. It appears that in this day and age, people will believe anything. Alexander has a long history of manipulating search engine results and the media and, let's face it, sex sells.

36. Strongly refute/deny. I consider Alexander to be a full-fledged, long practicing misogynist. I will provide examples upon request that support this belief. He has a history of engaging in toxic narcissistic abuse patterns with the only two official girlfriends (i.e. not his random sex partners) he has had and has long been misogynistic towards me, his stepmother, and certainly in his rants about Dr. Prause, as just several examples. The earlier girlfriend's father removed her from the city in which Alexander lived to get her away from his control and chicanery, while the later girlfriend's father attempted to do so but failed. That said, at the time of this writing, that girlfriend is now living in her parents' home.

37. Strongly refute/deny. As a woman who could have died by my own son's hand on at least three occasions (twice because I put myself between the gun being held through a bag and crowds of other people, and once during an all-out rage-filled diatribe about what he felt entitled to and that I was not providing to him), I strongly refute/deny that Alexander has any issue with violence against women. I consider his practice of always carrying a firearm, speaking in threatening and/or deranged tones, and causing me to fear for my life as factors when, taken apart or together, are quantifiable as violence. The definition of "promoted," however, would need to be understood in its fullest sense (i.e. not limited to publishing or uttering in public) to include experiences I have personally been through, including the closest I have even been to having been shot/killed by Alexander (see above), my own and only child, in my garage in the Spring on 2016. Note that even with severe mental illness and personality disorders, each believed to be diagnosed but untreated due to Alexander's non-compliance, Alexander is the owner of an entire *arsenal* of firearms, including four guns and one semi-automatic weapon.

As of August 9, 2020, I learned that Alexander took away his girlfriend's legally registered gun (her sole firearm) in November of 2019 and claims he does not know where it is, to this day. I do not in any way believe he cannot find that firearm. On August 16, 2020, I encouraged his girlfriend during our phone conversation to report that firearm as missing so, at the very least, she would be protected in the event an incident would ever be carried out with that gun. She had shared with me the week before, again by phone, that on at least one occasion, Alexander left one of his (unlocked) guns "outside overnight, on the steps" for anyone to have found. As of today, I have no reason to believe she has reported her gun missing. She agreed she should report it but then referred to knowing that doing such would make Alexander upset. To put it mildly, Alexander is an irresponsible gun owner. Note that, fascinatingly, Alexander did not lose track of the physical whereabouts of the at least five firearms that comprise his personal arsenal but deprived his girlfriend of her one firearm since November 2019 while claiming to have lost it.

I contend that Alexander is a danger to others, in general and, in particular, to females and/or those of other gender identities he does not approve (I can furnish two examples of what I mean by this last phrase re: "other gender identities"). Note that I have not allowed him to be alone with me in any non-public space since the Spring of 2016, for my own protection.

I absolutely consider Alexander to be capable of violence against women. He is the greatest danger to those who know the real him, as well as his longstanding motives to manipulate and con women, in particular, along with the masses through the media.

I, as that person, stand at the greatest risk of being the female target of his well-armed wrath. By reaching out to Dr. Prause, her counsel, and now with this written statement, I understand the risk I am placing myself in terms of becoming Alexander's target for Internet and other bullying, litigation, and for bullets through my

body. He has been verbally vicious with me on countless occasions in the past, without provocation, as well as put my life in direct harm on that Spring 2016 day in my garage, and I fully believe he is capable of committing any sinister, manipulative, or otherwise dark act it takes to keep his narcissistic supply of money, media attention, and fame alive and well.

With these risks in mind, I still step forward. No matter how dark Alexander has become, I feel compelled to shine light where none has heretofore been allowed.

38. Strongly refute/deny. Again, with respect to the legal definition of "promoted" and as pertains to this case, I can only attest to the fact that I believe my adult son is as strong an anti-Semite as can be found. Examples can be furnished upon request.

In fact, when the shooting in Pittsburgh occurred and as stipulated in his pleadings, my first instinct was to ascertain whether my son was the gunman.

51. While I do not have first-hand knowledge if my adult son has ever threatened to rape someone, he had relayed to me a story in which, while having sex with an unnamed drunk woman in Tel Aviv while the two were in the shower, she fell backwards on her head, causing her, in his description, to bleed profusely from her head. Then he just laughed. When I asked whether she had made a full recovery, he laughed again and said he would have no idea, that he didn't think he could even remember her name. At the very least, this vignette displays disregard for that particular female sex partner.

61. Alexander spoke specifically about this "bitch" and what I'll refer to in this document as the "c" word causing him problems, in general, and then with his intended taping of *The Doctors*. Alexander often entertained extreme fixations, obsessions and, at times, what sounded like delusions about many things. He spoke to me for numerous hours about how much he "hate(d) that bitch," referring to Dr. Prause, and how he would have to equip himself with 24/7 personal security surveillance gear while in California to film *The Doctors*. He has wished ill against her during conversations with me, numerous times, well before the filming of that show, and he always sounded to be in a very agitated state while doing so.

Alexander shared with me that he always carries a firearm, in general, as well as while traveling (checked when by air) and, taking into account that Alexander told me that he spent a great deal of money on some sort of physical surveillance for his body 24/7 and that he was 100% certain he would interact with Dr. Prause while in California, I was seriously concerned about what he might do during that trip. It also made me wonder in what other ways and other times he would put such body surveillance equipment to use.

He was consistently intent on "taking her down" but was always also obsessed about the "big money" from "the porn industry" that he contended supported her every move, including but not limited to having, as he described it, two full-time publicists. He was upset that he did not have "a fancy publicist" and endless money, but it's clear he was able to find the endless money for this lawsuit through what I discovered several months later, a Seattle-based therapist who created a funding page to finance what I contend is this needless and unwarranted litigation. Notably, he also was able to keep any and all NoFap money earned for himself, not contributing to his own mortgage payment and choosing, instead, to put that burden fully on his girlfriend, who also catered to him full-time by maintaining the cooking, cleaning, upkeep, repairs, and other tasks associated with the property and day-to-day living.[6] If his girlfriend went on a work trip, he would not

[6] The girlfriend shared with me this summer that Alexander would have her handle chores and home repairs, as such activities were suitable for her but not for him, intimating how much higher value he was than her. With me,

eat unless she prepared and sorted meals for him ahead of time. He would not bathe. He barely slept. He had her believe and tried to demonstrate that he was incapable of handling the basic tasks associated with daily living for his person or for their home.

67. Strongly refute/deny. Other than in the intricate web of his fabrications for purposes of material gain, I in no way see how Alexander has been harmed, financially or otherwise. In fact, this lawsuit has aided his overall and ongoing, long-term rather robust self-generated PR campaign and, it appears, financially (through the funding site).[7] I would argue that being enriched thus far by in excess of $146K is the opposite of being harmed, as well as by the additional PR and coverage around this suit.

85. I contend that Alexander maintains extremist values and has supported, in conversations with me, violence against women. He refers to me as a "libtard" (after he suddenly switched from supporting Rand Paul, then to being a Bernie, including actively working on his campaign, to becoming a Trump supporter) and a "dirty Jew," "cheap Jew," or "old bitch," among many other derogatory terms, and has often shared his strong desire to become a "cult leader," with many minions whom he fantasized about housing and controlling. He has used the same terms (around being old, ugly, and a bitch) about Hillary Clinton as he did for Dr. Prause as well as for me, all in what I consider to be the thinnest of veils to conceal his underlying and pervasive misogyny. Alexander has often fantasized about being a cult leader, among other things.

Many reasonable people feel that cults are extremist. Many reasonable people feel that unchecked rage is extremist. May reasonable people feel that the need to isolate his girlfriend was extremist. In fact, while the property he and his girlfriend purchased was quite large (i.e. it was originally a hotel), he fantasized and sent me pictures obtained from Zillow of "the perfect compound for my cult," away from neighbors, prying eyes, and others. He reminded me, too, from time to time, that the Internet would already know that I was a Jew and, when it was time to "round you up again," I should be fearful. He wondered aloud about himself, too, in those conversations. My first full-time role after college was as a staff reporter for *The Jewish Chronicle*, as well I had taught part-time in a synagogue. While his father is not Jewish and was an atheist when we met

---

he would be very direct about how he saw me but, evidently, with her, she said he revealed these beliefs from time to time and in a more subtle manner (once in front of a handyman, who intervened on her behalf). Where he would call me trash, white trash, dirty Jew, a lower value person, etc. he would refer to her, evidently, as not as smart, talented, important, famous, etc. as himself, thereby she should handle the less desirable aspects of his life.

[7] Please see https://donorbox.org/defend-alex -- where, as of today, in excess of $146K has already been raised. Alexander is a long-time conman. When I first saw this site, I reached out to the therapist on the video, who spoke to me briefly but with discomfort and some derision. It sickened me to see not only this site but the audacity of his shift in the past year to pretending to be a super Jew, and to caring about the shooting in Pittsburgh. Alexander has often taken what I'll call kindness nuggets he learned from me and used them to appear more virtuous. As one example, when someone he interacted with online died in a house fire, I told him to use his finely tuned money raising and Internet skills for good to raise money for this person's funeral to take the burden off his family. He thanked me and ran with the idea, saying it would make him "look really good on the Internet." More recently, and from what I just only heard from his girlfriend, Alexander is now claiming he was sexually abused as a child when, in reality, that was my background, not his. He knew nothing of my background or life until I told him when he was 23, in that same conversation referenced earlier, and he evidently uses that, too, to excuse away his ill treatment towards this girlfriend and his lack of intimacy the second time they were together (after their first break up, she dated others and was engaged when he came back and pressured her to leave the fiancée for him). He now claims, evidently, that he also has "inherited trauma," not only from my background (of which he only knows a limited amount) but because two of my biological grandparents fled Germany. I don't have words for how sick and depraved Alexander is, period. Whereas he used to brag about having been "coddled" throughout his childhood and into his early adulthood, he's now evidently claiming abuse as an excuse for mistreating his girlfriend.

(evidently later becoming Catholic), Alexander attended Catholic high school (after a rather ugly anti-Semitic campaign with his father to fight in court together against me, a mother who fully believed in the value of public schools as an important equalizer in a healthy democracy), and that he now sees, according to his girlfriend, a "Christian counselor" online (note, too, that he has indicated to me on numerous occasions that he wants to raise his future children with homeschooling based on Christianity and its wholesome values and, when he cheated on his girlfriend and was going to run off and marry his paramour in the summer of 2019, extolled the virtues of her "good Christian values" and her "not being a whore like" the girlfriend he actually lived with and, later as I learned it, lived off of). He often (as his girlfriend first shared with me by phone in January 2018) judged his live-in girlfriend for being impure, not worthy of marrying, not virtuous, and other judgments that displayed what could only be described as extremist values and, quite frankly, extremely gender-based (i.e. misogynistic). While she was fully and long-term supporting him, fascinatingly, he would proclaim his fear around her taking all of his money should they ever marry and then divorce, which he used as further justification not to marry her.

I could go on and on in terms of describing more extremist values, as well, around race, sex, firearms, cults, slaves/minions, politics, social orders, and other areas, but I think the message here is clear. He considers his assistant, Matthew, to be the first of his minions and a model for future ranks of such.

90. Loss of capital? Really? As of Aug. 1, 2020, he had not once made a mortgage payment for the 2 ½ years he has been a mortgage holder. He does not support himself, rather, he has been supported by his well-employed girlfriend.[8]

Around June 2019, Alexander broke off relations with a purported business partner named Mark Queppet so, as Alexander described to me, he could earn the money "he was taking" from him. Continuing to string his girlfriend along (and, of course, what he reported to me), he claimed that he would be making "even bigger money." He promised his girlfriend he would create programs to finally earn money (as she, not I, was in the know that he was not earning/not paying their mortgage) and then, in the short span of two weeks, was able to both create and launch the groups (described, by her, as support groups with Alexander serving as the facilitator), hence creating an income stream.

97. Really? Shame? Humiliation? A person who willingly and with great effort created a fake back story around masturbation is suddenly shamed and humiliated? A man who willingly and with great effort adds to that fabricated back story each year to the detriment of reality can feel shame? A man who lives off the work of his long-term, loyal, industrious girlfriend suddenly feels shame and humiliation? A man who controls women, judges them through a misogynistic lens, bullies them, etc. is going to now feel shame and humiliation? A man who is a tyrant with others, including reporters? Filing fake stipulations within his pleadings against a neuroscientist is not shameful? In terms of mental suffering, Alexander consistently creates his own mental suffering. He is always fixated on something that he points to causing him to not sleep, for instance, and that consumes his every waking thought. When spending time with me, he would not engage in what reasonable people would consider regular conversation. Everything was self-obsessed, absorbed, and often extremely disturbed. In fact, that has been happening since early childhood, when a psychiatrist (M.D.) shared with Alexander's father that people like this aren't made, they are born this way.

---

[8] In addition to the full-time job she has maintained since college graduation eight years ago, she has also worked as a part-time fitness instructor and runs an Ebay shop. I do not believe these last two endeavors are as steady nor add much to her overall income. COVID-19 probably meant gym closures in PA, as she recently shared with me that she went to a gym to enjoy a workout for the first time in months.

---

Leads to follow include but are not limited to:

The named reporter who, if having any trouble remembering his conversation with me, I could weigh in to refresh his memory of such. To cover his own tracks of performing shoddy reporting, he had no interest in the truth. He was interested, however, when I mentioned the incident in my garage. I refused to let him run with that story, as I was at that time enshrouded in pain, shame, and acute feelings of powerlessness.

Michael Donnelly, aka "Mercury" during the World of Warcraft botting years, last known whereabouts in Phoenix, Arizona; former owner of MDY Industries (easy to find litigation records between his endeavors and Activision Blizzard re: World of Warcraft botting), who could speak to what was really taking up Alexander's time for many years (i.e. not the backstory he concocted for NoFap).

Jennifer Taub, former student, University of Pittsburgh (look for years that coincide with Alexander's tenure there) – half Jewish (this fact is relevant for some very distinct reasons). The last I heard from Alexander, she had gone to graduate school to become a therapist or psychologist.

Current girlfriend = [would need to request her permission to provide her name]

---

RE: Ocktra/Glider/Botting/Gamer Keys
While fabricating his backstory about NoFap, Alexander did an excellent job removing extensive postings, intricate YouTube videos, forums, and other information about his very long-term, extremely time-consuming, and more often than not tax evading days in the botting world against Activision Blizzard's World of Warcraft, where he was extremely well known as "ocktra." He made his way to the 10 Most Wanted list one year and attended BlizzCon (I will surely have an old photo or two) in California.

That said, I was able to readily find a few last remnants, with screenshots captured below:

Declaration of Althea Azeff, JD
Mother of Alexander Rhodes of NoFap
Client of Aaron Minc

https://n4g.com/news/685471/mmoglider-speaks-about-blizzard-lawsuit
MMOGlider speaks about Blizzard Lawsuit
Botchweed: "Alexander "Orktra" Rhodes from MMOGlider, the service which provides many World of Warcraft players with an automation bot has spoken out about their company being sued by Blizzard Entertainment."
Read Full Story >>
Releases.com - Your guide to Game, TV and Movie Releases
Type here to search

MMOGlider's Final Update
Type here to search

89





(https://www.ownedcore.com/forums/content/category/1-world-of-warcraft-page6.html)

MMOGlider's Final Update

**Jeremiah**

shed on 08-17-2011 07:10 PM

World of Warcraft

Mercury of the Glider forums has made one final announcement about the MDY versus Blizzard Entertainment lawsuit that spanned the last couple of years. The monumental case rocked the MMO gaming world and defined the future for bot coders and consumers. This case is especially relevant considering Blizzard Entertainment is also taking legal action against Bossland GmbH in the ongoing Bossland GmbH versus Blizzard Entertainment Honorbuddy/Gatherbuddy lawsuit.

Ocktra was kind enough to provide an update about Glider's company, MDY, written by Michael Donnelly from Glider's official forums. Donnelly from Glider's official forums.

*Originally Posted by Michael "Mercury" Donnelly*

*We've settled the lawsuit with Blizzard, so things are going to happen fairly quickly around here. I can't go into a ton of detail, but I can say I'm glad to be able to close the book on that particular ugliness and move on with a relatively*

*regular life, even if it means no Glider. I can also divulge that my proposed title for the next WoW expansion, "WoW: Mercury Is A Cool Guy And Needs A Nice Girl Who Also Doesn't Mind Cooking" didn't make it very far.*

*For Glider customers, this means not much change from where we are now. There was simply no way we could get by Judge Campbell to get Glider back on the market, although we came pretty close. Regardless, there is no point in running forums with no future for Glider.*

*On Monday, August 22nd, we will be taking down the site and forums. I imagine I'll be around here quite a bit more until then, at least once I get back to Phoenix later today.*

*Most of the people who have helped out through the years will not see this, but I imagine some folks will cross-post this message on other forums. You have my most sincere appreciation, everyone from OMW to Ocktra and all the others. The community is what made Glider into a true force and I never would have made it this far without you. Losing that through the injunction has been the worst part for me.*

*I'm not sure what I'll be doing next, but I'm quite certain it won't involve anything to do with Blizzard. Maybe some kind of regular job that doesn't involve a*

*constant barrage of legal and technical attacks. Imagine that.*

*And, no, I'm not interested in automating Rift unless your job offer includes a hefty starting bonus. Think Ferrari 458-sized.*

*So long, and thanks for all the cookies.*

OwnedCore has long supported Glider and MDY in their lawsuit against Blizzard Entertainment, and MDY (and ocktra) were quick to forward their thanks for years of moral support. Let us only hope that products like Glider and Honorbuddy can be protected from predatory corporate behavior in the future.

5 Comments

1.
- 08-17-2011
Reply

" Let us only hope that products like Glider and Honorbuddy can be protected from predatory corporate behavior in the future." Amen to that Aphel.

2.

Declaration of Althea Azeff, JD
Mother of Alexander Rhodes of NoFap
Client of Aaron Minc

- 08-18-2011

Reply

Ocktra is my man bitch..... Sad days indeed.

3.

Baaja - 08-18-2011

Reply

It's a shame, I was very interested in and curious of what they were cooking up behind the scenes for their supposed comeback. I was never a big fan of Glider and didn't use it by the time they got PPather, but I know it was a great tool and great dev team. They really had the biggest botting community and while it was up and running, those were the glory days of botting in WoW. Sad to see it go now. Wonder what the future looks like for Honorbuddy and the like.

4.

- 08-18-2011

Reply

release the source of everything and let hell break lose /end

5.

- 08-19-2011

Reply

92

I wish all the best for Merc and the rest of MDY. Glider really was a momumental part of WoW botting history and certainly my experience with WoW

Also see:

https://www.epicnpc.com/threads/world-of-warcraft-cd-keys-game-cards-registered-business-legit-fast.195111/

https://www.neogaf.com/threads/blizzard-wins-7-million-in-bot-company-lawsuit.702406/

https://www.epicnpc.com/feedback/58342?reloadList=1&amountFilter%5B0%5D=1

https://www.youtube.com/watch?v=f3ATGyDOB3U (Alexander removed all of the *numerous* tutorial videos, highly sophisticated marketing videos, and others, but one or two that were made by others remain)

---

Alexander has a long history of manipulating SEO and SEM, overall as well as particularly through Reddit. Before NoFap really took off and overlapping, he catapulted himself into very high search ratings as an extra in Hollywood movies filmed in Pittsburgh (*The Perks of Being a Wallflower*, one of the *Batman Dark Knight* movies, *Jack Reacher* . . . ).

As he did then, Alexander claimed Reddit drove his celebrity on its own, rather than through his own purposeful machinations.

His girlfriend shared with me recently how he called her during that time, when she was engaged to another man (and from whom Alexander pressured her away), telling her how famous he was and was going to be and that she'd never be anything. This share mattered a great deal to me, as Alexander used to talk incessantly with me back then about how good looking, talented, and famous he was and would be and that no one else understood what it was like to have to deal with sudden attention and fame, to the extent he quit school to move to Los Angeles to become a Hollywood star, and that I was a such a loser who had to work for a living, a dirty Jew, etc.

Whenever I would bring up these conversations with Alexander, he would aggressively gaslight me. For Chelsea to have brought up similar speech and claims was, to say the least, helpful however extremely disheartening, as Alexander's pattern is to show his most secret, dark, and abusive self only to the very few women in his life. Whenever I would bring up either the famous actor claims or the ocktra years, he would gaslight me, as well. Same for when I brought up his years of tax evasion about which he used to brag to me. Same when I brought up anything of substance around accountability for his words or actions.

Any reporter or news outlet worth its salt could have conducted elementary-level research on the NoFap backstory to trace his infamous "ocktra" days with World of Warcraft to his "suspicious onlooker" days to NoFap. It does not take much work to unearth Alexander's trajectory in terms of creating hype, attention, and fake back stories around himself online through SEO, SEM, forums, subreddits, and the like.

A simple search for the propaganda he created around himself as just one of hundreds (and up to possibly thousands) of extras, yields the following starter crumbs to follow:

Declaration of Althea Azeff, JD
Mother of Alexander Rhodes of NoFap
Client of Aaron Minc

Alexander Rhodes/Suspicious Onlooker | Know Your Meme
Alexander Rhodes - IMDb
A Suspicious Onlooker: The story of... - Alexander Rhodes ...
I am Alexander Rhodes - the Suspicious Onlooker, aspiring ...
Meet Alexander Rhodes: Suspicious Onlooker | The Imgur Blog
Reddit Makes Suspicious Onlooker More Famous Than Tom ...
Suspicious Onlooker
Movie: Jack Reacher
Type here to search

**Conclusion:** In this document, in addition to providing context and background, I addressed 17 of the 98 stipulations in Alexander's amended pleadings. I am not qualified to form an opinion on the merits of the legal case, the merits of the academic debate, nor any other substantive considerations related to this matter. As the plaintiff's mother who knows the real back story of NoFap, I felt, at long last, compelled to come forward.

94